591 So.2d 911 (1991)
Leo Alexander JONES, Appellant,
v.
STATE of Florida, Appellee.
No. 78907.
Supreme Court of Florida.
November 14, 1991.
Rehearing Denied January 31, 1992.
*912 Larry Helm Spalding, Capital Collateral Representative and Thomas H. Dunn, Asst. CCR, Office of Capital Collateral Representative, Tallahassee, for appellant.
Robert A. Butterworth, Atty. Gen. and Mark C. Menser, Asst. Atty. Gen., Tallahassee, for appellee.
PER CURIAM.
Leo Alexander Jones, a state prisoner for whom a second death warrant has been signed, appeals the denial of a motion for postconviction relief and requests a stay of his execution. We have jurisdiction under article V, section 3(b)(1) of the Florida Constitution.
Jones was convicted of the 1981 murder of Officer Szafranski of the Jacksonville Police Department. The trial judge followed the jury's recommendation and sentenced Jones to death. This Court affirmed the conviction and sentence. Jones v. State, 440 So.2d 570 (Fla. 1983). Jones later filed a petition for habeas corpus which this Court denied. Jones v. Wainwright, 473 So.2d 1244 (Fla. 1985). Jones then filed a motion for postconviction relief under Florida Rule of Criminal Procedure 3.850. The trial court denied this motion, and this Court affirmed. Jones v. State, 528 So.2d 1171 (Fla. 1988). Following the signing of his first death warrant in September of 1988, this Court denied Jones' petition for habeas corpus. Jones v. Dugger, 533 So.2d 290 (Fla. 1988). A federal district court granted a stay of execution but later held that Jones was not entitled to relief. The Eleventh Circuit Court of Appeals affirmed. Jones v. Dugger, 928 F.2d 1020 (11th Cir.), cert. denied, ___ U.S. ___, 112 S.Ct. 216, 116 L.Ed.2d 174 (1991).
The essential facts surrounding the murder were set forth in our original opinion:
The evidence at trial showed that on May 23, 1981, shortly after 1:00 A.M., Officer Thomas J. Szafranski was shot in his squad car at the intersection of 6th Street and Davis Street, Jacksonville, Florida. Officer Wilmouth was first on the scene. While Wilmouth waited for medical assistance to arrive a group of people came out of a nearby bar and approached him. One unidentified member of the group indicated that the shots had come from the two-story apartment building fronting the 6th and Davis Street intersection. Thereafter Wilmouth proceeded to investigate this building.
Officer Mundy had been informed of the incident by radio and quickly joined Wilmouth in the investigation. According to Mundy, the reputation of the apartment building in question was well travelled in law enforcement circles. Mundy entered the building fully aware that the vacant lower left apartment was a known "stash house" harboring drug users, vagabonds and other street criminals.
The two officers' search of the building's lower level produced nothing. However, Wilmouth informed Mundy that he had heard "shuffling" in the upper left apartment. Thereafter Mundy approached this apartment, knocked on the door, and proceeded to identify himself as a police officer. His repeated knocking, however, went unanswered. When Mundy continued to hear voices coming from within he entered the apartment; there he confronted appellant and appellant's cousin, Bobby Hammond, charging them both with attempted first-degree murder. During a cursory search of the apartment, assisting officers located several high-powered rifles, resting in plain view, but did not, at that time, disturb them.
Both appellant and Hammond were then transported to the Police Memorial Building. There, after being given repeated Miranda warnings by Officer Eason, appellant signed a statement incriminating himself and exonerating his cousin, Hammond.
Jones, 440 So.2d at 572.
Prior to trial, Jones moved to suppress his confession. He and Hammond testified *913 that the police beat them both at the scene and at the police station. The police acknowledged striking them at the scene but testified that it was necessary to do so because they were resisting arrest. The police denied hitting them at any other time. Prior to obtaining Jones' short two-sentence confession, they took him to the hospital. The attending doctor testified that Jones had only superficial injuries. The trial judge refused to suppress the confession, and this ruling was ultimately approved on appeal.
At trial, the State relied heavily upon the confession. However, there was also testimony that about a week prior to the murder Jones had told a police officer that he was tired of being hassled by the police and that he intended to kill a pig. Further, Hammond testified that on the night of the murder, he saw Jones leave the apartment with a rifle in his hand. Hammond then heard gunshots and shortly thereafter Jones returned to the apartment still carrying the rifle. This testimony was consistent with the State's theory that Jones had fired the shots from a downstairs apartment. However, Hammond was impeached by an earlier sworn statement to the effect that he did not see Jones with a gun that night. The police found two rifles in the apartment, but the condition of the bullets in the officer's body prevented them from making a ballistics comparison. A hand-swab test was taken to determine whether Jones had recently fired a gun. However, the crime laboratory analyst testified that there was an insufficient amount of antimony present for him to reach any conclusion. He explained that he would have expected this result because of the four-hour delay in taking the test and the fact that a rifle rather than a pistol was involved.
Jones' first motion for postconviction relief focused primarily upon allegations of ineffectiveness of trial counsel. Among these allegations was the contention that counsel was ineffective for failing to locate Marion Manning, whose boyfriend, Glen Schofield, was Jones' roommate and owned the guns used in the shooting. Jones argued that Ms. Manning would have testified that Schofield was at the scene at the time of the shooting and that shortly after the shots were fired he jumped into her nearby car and told her to drive away. Trial counsel, H. Randolph Fallin, testified that he recognized that Schofield might be a suspect but said that Schofield refused to talk to him when he tried to interview him at the jail where Schofield was being held following an arrest for an unrelated crime. Fallin further stated that neither Schofield nor anyone else had given him the name of the woman who was supposed to have been with Schofield following the shooting. In rejecting this argument as a basis for postconviction relief, we said:
Accepting the judge's finding that he was never told her last name, Fallin cannot be faulted for not locating Marion Manning. Moreover, it is questionable whether she could have been helpful to the defense because she testified at the postconviction hearing that as he got into the car, Schofield told her that appellant had shot the policeman.
Jones, 528 So.2d at 1174.
The current motion for postconviction relief alleges (1) that counsel was ineffective for failing to locate and present witnesses other than those referred to in the first motion for postconviction relief, and (2) that Jones is entitled to a new trial because of newly discovered evidence. Clearly, Jones is not entitled to relief on the first ground. Jones has already had a full and fair hearing on his claim of ineffectiveness of trial counsel. A defendant may not raise claims of ineffective assistance of counsel on a piecemeal basis by filing successive motions. Francis v. Barton, 581 So.2d 583 (Fla.), cert. denied, ___ U.S. ___, 111 S.Ct. 2879, 115 L.Ed.2d 1045 (1991); Squires v. State, 565 So.2d 318 (Fla. 1990). Moreover, his current motion was filed beyond the two-year time limit of Florida Rule of Criminal Procedure 3.850. However, allegations of newly discovered evidence fall within the exception to the two-year requirement of rule 3.850. Therefore, Jones' claims of newly discovered evidence must be carefully considered.
*914 The evidence which Jones claims to be newly discovered is reflected by affidavits attached to his motion and includes the following:
(1) Patricia Owens (then Ferrell) stated that she was living with Glen Schofield at the time of the murder and that he had complained to her about being harassed by the police. She said that after the murder Schofield told her to tell the police that he was home with her when the murder occurred and that he made an equivocal statement which implied that he was the killer. She further stated that a week after the killing Schofield went to jail for robbing a bank but that when he got out of prison eight years later he bragged to her about killing Officer Szafranski.
(2) Linda Atwell, who was Jones' girlfriend, stated that as she left Jones' apartment on the night of the murder Schofield passed her running upstairs holding a rifle or a shotgun. In response to her inquiry of why he was running up the stairs, he replied, "Them crackers are after me."
(3) Katherine Dixon stated that she and her boyfriend, Tony Brown, were waiting at their apartment to meet Schofield on the night of the murder, but he never showed up. The following morning she saw a gun in the closet. Brown told her it was a 30-30 rifle but refused to tell her who owned the gun. Brown took the gun, and she never saw it again. Soon after, Brown and Schofield were arrested for robbing a bank.
(4) Daniel Cole stated that he was walking with his girlfriend, Denise Reed, near the murder scene on the night the officer was killed. He heard a shot and within a few minutes saw Schofield running from the area behind Jones' apartment house holding a rifle in his hand.
(5) Denise Reed gave a statement which essentially corroborated that of her boyfriend, Daniel Cole.
(6) Frank Pittro, who is presently in jail at Marion Correctional Institution, stated that he met Schofield at a time when both of them were incarcerated in Union Correctional Institution in 1985. He said Schofield bragged to him on more than one occasion about how he killed a Jacksonville police officer and got away with it. Schofield told him the officer had been harassing him for a long time, and he described how he took a high caliber rifle and shot him. Schofield then told him that he ran through an apartment building and out the back to get away from the police. Schofield also told him that Leo Jones had been arrested for the killing but that Jones had nothing to do with the crime.
(7) Franklin Delano Prince, who is an inmate at Union Correctional Institution, stated that in 1985 or 1986 Schofield told him that he killed a Jacksonville police officer and that Leo Jones was in prison for the murder. He said that Schofield confessed the killing to many others, including another inmate named John Davis.
(8) An investigator of the Capital Collateral Representative (CCR) reported an interview with Paul Marr. Marr is said to have told the investigator that Marr and Schofield were both incarcerated at Union Correctional Institution in 1985. At that time, Schofield described to Marr how he killed a Jacksonville police officer in 1981. Schofield explained that he obtained a rifle from an apartment building, shot the officer, returned the rifle to the apartment, and exited through the back door of the apartment building where he was later picked up by a woman friend. Marr said that Schofield had told him that Leo Jones was on death row for the crime that Schofield had committed.
(9) In preparing to defend against Jones' current motion for postconviction relief, the Duval County assistant state attorney John Jolly discovered certain documents in his file which he immediately disclosed to CCR. Those documents reflected that in 1990, Michael Richardson was in the Clay County Jail awaiting trial for robbery. In trying to negotiate a plea bargain, he told an assistant state attorney that Schofield was responsible for the 1981 murder of a Jacksonville police officer. This information was passed on to the Duval County Sheriff's Department. A representative of that department interviewed Richardson, who confirmed that he had overheard Schofield telling how he committed the crime.
*915 After the filing of Jones' current motion, the trial judge held an emergency Sunday afternoon hearing at which both counsel made comprehensive arguments on the legal sufficiency of the motion. The judge denied the motion, reasoning that the ineffective assistance of counsel claim was procedurally barred and that that portion of the evidence which could be deemed newly discovered would not have compelled a verdict for Jones in the event it had been introduced at trial. In so ruling, the judge employed the standard mandated by this Court for measuring the validity of petitions for writ of error coram nobis involving newly discovered evidence.
The seminal case on attempting to set aside a conviction because of newly discovered evidence is Hallman v. State, 371 So.2d 482, 485 (Fla. 1979), in which this Court said:
The general rule repeatedly employed by this Court to establish the sufficiency of an application for writ of error coram nobis is that the alleged facts must be of such a vital nature that had they been known to the trial court, they conclusively would have prevented the entry of the judgment. Williams v. Yelvington, 103 Fla. 145, 137 So. 156 (1931); House v. State, 130 Fla. 400, 177 So. 705 (1937); Baker v. State, 150 Fla. 446, 7 So.2d 792 (1942); Cayson v. State, 139 So.2d 719 (Fla. 1st DCA), appeal dismissed, 146 So.2d 749 (Fla. 1962). In Russ v. State [95 So.2d 594 (Fla. 1957)], this Court expressly stated: "The showing must be such that if the matters shown had been before the trial court when judgment was entered, the court would have been precluded from entering the judgment." 95 So.2d at 597 (emphasis added). This traditional "conclusiveness test" in error coram nobis proceedings is predicated on the need for finality in judicial proceedings. This is a sound principle, for litigants and courts alike must be able to determine with certainty a time when a dispute has come to an end.
In Preston v. State, 531 So.2d 154 (Fla. 1988), we explained that under the Hallman standard, if the sole prosecution witness recanted his testimony, a petition for coram nobis could be granted. However, if the newly discovered evidence did not refute an element of the State's case but rather only contradicted evidence that had been introduced at trial, the petition must be denied. In a concurring opinion, Justice Overton, joined by Justice Kogan, contended that the probability test for granting new trials on the basis of newly discovered evidence as set forth in Florida Rule of Criminal Procedure 3.600(a)(3) should be applicable to petitions for writ of error coram nobis.
Recently, this Court receded from Hallman to the extent that we held that all newly discovered evidence claims should now be brought in a motion pursuant to Florida Rule of Criminal Procedure 3.850 and that such claims would not be cognizable in an application for writ of error coram nobis unless the defendant was not in custody. Richardson v. State, 546 So.2d 1037 (Fla. 1989). It has been argued that our decision in Richardson also changed the Hallman standard of review for claims based on newly discovered evidence, but we did not say this in our opinion. Upon consideration, however, we have now concluded that the Hallman standard is simply too strict. The standard is almost impossible to meet and runs the risk of thwarting justice in a given case. Thus, we hold that henceforth, in order to provide relief, the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial. The same standard would be applicable if the issue were whether a life or a death sentence should have been imposed. We note that this is the standard currently employed by the federal courts. United States v. Menard, 939 F.2d 599 (8th Cir.1991); United States v. Underwood, 932 F.2d 1049 (2d Cir.), cert. denied, ___ U.S. ___, 112 S.Ct. 382, 116 L.Ed.2d 333 (1991); United States v. Reed, 887 F.2d 1398 (11th Cir.1989), cert. denied, 493 U.S. 1080, 110 S.Ct. 1136, 107 L.Ed.2d 1041 (1990); United States v. Martin, 815 F.2d 818 (1st Cir.), cert. denied, 484 U.S. 825, 108 S.Ct. 89, 98 L.Ed.2d 51 (1987). See also Miles v. Nix, 911 F.2d 146 (8th Cir.1990) (applying same standard for newly *916 discovered evidence as a basis for habeas relief from state court conviction).
Before applying this new standard of review to this case, we must examine the evidence proffered by Jones and see whether it qualifies as newly discovered. The Hallman definition of newly discovered evidence remains intact. That is, the asserted facts "must have been unknown by the trial court, by the party, or by counsel at the time of trial, and it must appear that defendant or his counsel could not have known them by the use of diligence." Hallman, 371 So.2d at 485.
Referring to the proffered evidence, it appears that much of the evidence referring to events which occurred near the time of the murder may not qualify as newly discovered because if not already known it could have been obtained with the exercise of reasonable diligence. For example, Linda Atwell was Jones' girlfriend, and she said she was in his apartment earlier in the evening. Further, the name and telephone number of Patricia Owens, who is now said to be Schofield's girlfriend, were set forth in the police report. Therefore, anything she would have said about Schofield's activities before and after the murder may have been available to Jones' counsel. It also seems likely that Jones knew most, if not all, of the others who made statements concerning events contemporaneous with the murder and that their testimony could have been obtained, but this cannot be conclusively determined from the face of the pleadings. On the other hand, Schofield's confessions to the various inmates[1] other than Marr[2] and to Patricia Owens after he got out of jail clearly qualify as newly discovered evidence which should be considered.
The trial judge's order which rejected the claim based on newly discovered evidence was clearly correct under the Hallman standard. In light of Jones' confession as well as the other evidence introduced at the trial, it could not be said that the newly discovered evidence would have conclusively prevented Jones' conviction. Under the probability standard we have adopted in this opinion, we cannot be sure whether Jones' motion should be denied. On the face of the pleadings, we cannot determine whether some of the evidence can properly be said to be newly discovered. Moreover, we cannot fully evaluate the quality of the evidence which demonstrably meets the definition of newly discovered evidence. Therefore, we believe it necessary to have an evidentiary hearing on the claims that are based upon newly discovered evidence. At the hearing, the trial judge should consider all newly discovered evidence which would be admissible and determine whether such evidence, had it been introduced at the trial, would have probably resulted in an acquittal. In reaching this conclusion, the judge will necessarily have to evaluate the weight of both the newly discovered evidence and the evidence which was introduced at the trial.
We reverse the order denying Jones' motion for postconviction relief and remand the case for an evidentiary hearing in accordance with this opinion. As a consequence, we hereby stay Jones' pending execution.
It is so ordered.
SHAW, C.J., and OVERTON, BARKETT, GRIMES, KOGAN and HARDING, JJ., concur.
McDONALD, J., dissents with an opinion.
*917 McDONALD, Justice, dissenting.
Today the Court adopts a new standard for evaluating the effect of newly discovered evidence on a final judgment of guilt. Now we say that newly discovered evidence may be the basis for relief if it would probably produce an acquittal on retrial. Accepting every affidavit tendered by Jones to be true, the newly discovered evidence fails to meet that test. At best, it would show that another party, Glen Schofield, participated in the shooting along with Jones.[*] None of the newly discovered evidence exonerates Jones; it does not contradict his confession nor does it explain any of the circumstantial evidence linking Jones to the crime.
I would deny relief under either standard used on newly discovered evidence.
NOTES
[1] We do not view the circumstances surrounding the taking of Richardson's statement as a violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and we therefore reject the Brady claim Jones makes in this appeal. However, because CCR just learned of Richardson's existence, they may be excused for not yet procuring his statement. In any event, Richardson's testimony concerning Schofield's statements would be newly discovered evidence.
[2] Schofield's statement to Paul Marr is newly discovered in the sense that it could not have been known at trial. However, at the hearing on Jones' first motion for postconviction relief, he unsuccessfully sought to introduce Marr's testimony in support of his claim of ineffective assistance of counsel. Thus, the use of Marr's statement in this proceeding is procedurally barred because it was known at the time of Jones' first motion.
[*] There were two shots fired.