679 So.2d 736 (1996)
Roy Clifton SWAFFORD, Appellant,
v.
STATE of Florida, Appellee.
No. 85682.
Supreme Court of Florida.
July 11, 1996.
Rehearing Denied September 9, 1996.
*737 Martin J. McClain, Chief Assistant CCR, Office of the Capital Collateral Representative, Tallahassee, for Appellant.
Robert A. Butterworth, Attorney General and Margene A. Roper, Assistant Attorney General, Daytona Beach, for Appellee.
PER CURIAM.
Roy Clifton Swafford appeals an order entered by the trial court denying relief sought under Florida Rule of Criminal Procedure 3.850. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
Swafford was convicted of first-degree murder and sentenced to death. This Court affirmed his conviction and sentence. Swafford v. State, 533 So.2d 270 (Fla.1988), cert. denied, 489 U.S. 1100, 109 S.Ct. 1578, 103 L.Ed.2d 944 (1989).
On September 7, 1990, Governor Martinez signed a death warrant scheduling Swafford's execution for November 13, 1990. Swafford filed a motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850. The motion included a Brady[1] claim which alleged in part that the State had withheld material exculpatory evidence obtained during the investigation of various suspects including the suspect James Michael Walsh. According to Swafford, the evidence allegedly withheld by the State included statements to the police by Michael Lestz, who was among the suspects investigated regarding potential involvement in the murder of Brenda Rucker. Lestz recounted certain statements and activities of James Michael Walsh which heightened Walsh's status as a potential suspect in the Rucker murder investigation.[2]
Also alleged to be in the police reports provided to Swafford was evidence establishing that when Walsh was arrested on several occasions following Rucker's murder, he had in his possession each time a composite drawing of the Rucker murder suspect, which he resembled.[3] Police reports indicated that when interviewed about the Rucker murder, Walsh became nervous and upset and refused to divulge to investigators his whereabouts on February 14 and 15, 1982.
Swafford further alleged that police reports provided to him indicated that Walsh was known to carry a .38 caliber handgun, the same type of weapon used in the Rucker homicide. Furthermore, the reports showed that when police in Arkansas searched Walsh's residence, they found various types of .38 caliber ammunition. Several types of.38 caliber ammunition were removed from Rucker's body during the autopsy. Also found on Rucker's body were cigarette burns similar to those allegedly inflicted on Lestz by Walsh during homosexual attacks.
The trial court summarily denied Swafford's motion. With regard to the evidence Swafford claimed the State did not disclose concerning other suspects, the court stated:
The court finds that the state was not required to provide Swafford with information regarding all suspects investigated. There is no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case. Moore v. Illinois, 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972). Swafford has failed to *738 show that the hearsay information on other suspects was admissible or prejudicial.... There is no reason to believe that even if all this information had been available to defense counsel that it would have assisted him or have been presented at trial. The court finds that even if the information had been presented there is no reasonable basis on which to find the outcome would have changed. Duest v. Dugger, 555 So.2d 849 (Fla.1990).
This Court affirmed the denial and denied Swafford's petition for a writ habeas corpus. Swafford v. Dugger, 569 So.2d 1264 (Fla. 1990). With regard to Swafford's Brady claim, the Court stated:
The court found that no Brady violation had occurred and that Swafford had not established the materiality of the information he claims the state withheld.... Swafford has shown no error in the court's ruling, and we hold that the court correctly refused to hold an evidentiary hearing on the claim.
Swafford, 569 So.2d at 1267.
After this Court rendered its decision, the Eleventh Circuit granted Swafford a stay of execution. Swafford's appeal to the Eleventh Circuit was held in abeyance while he continued to seek relief in the state courts. In May 1991, Swafford filed a second habeas petition in this Court, which we denied. Swafford v. Singletary, 584 So.2d 5 (Fla. 1991). He then filed a second 3.850 motion in November 1991. In addition to appealing its denial, he filed a motion to relinquish jurisdiction and hold appeal in abeyance. The appeal was based on new information he obtained regarding the status of Swafford's trial attorney, Ray Cass, as a special deputy sheriff and alleged ex parte communications between the State and the trial judge. We granted the motion to relinquish jurisdiction so the trial court could address these issues. After a hearing, the trial court again denied relief and we affirmed. Swafford v. State, 636 So.2d 1309 (Fla.1994).
While Swafford's motion for rehearing with this Court was pending, defense counsel located Mr. Lestz. Lestz provided an affidavit dated April 30, 1994, which Swafford claimed corroborated other evidence the State failed to disclose in violation of Brady. The affidavit provided:
1. My name is Michael Eugene Lestz and I live in the state of Illinois. In 1982 I was in Daytona Beach, Florida during the Daytona 500. The Daytona 500 Auto Race took place on Sunday, February 14, 1982.
2. While I was there, I was in the presence of two guys named Walter Levi and Michael Walsh. Michael Walsh borrowed my van on several occasions and without telling me where he was going. I previously told the Daytona Beach sheriff's office about these occasions.
3. I remember, on the day of the Daytona 500, Michael Walsh had two 38 caliber handguns and was in a big hurry to get rid of them. One of these 38's was a hammerless revolver. He told me that the handguns had been used and he had to get rid of them. Walsh started going to different bars in order to get rid of the guns. One of the places Walsh went to get rid of these handguns was the Shingle Shack Topless bar. The three of us had been to this bar on several occasions and we were all very familiar with it. Also Michael was acting very nervous on this particular day. He said it was because he didn't want the guns in his possession.
4. A couple of days after the Daytona 500 and after Michael Walsh had gotten rid of the two guns, we were in the parking lot of a store and there were pamphlets about the Brenda Rucker homicide. Walsh became upset and began to snatch the pamphlets off the cars saying they shouldn't be looking for the suspect in Daytona Beach when she was not killed here. Walsh would never tell us what he meant by this.
5. Two sheriff's officers from the Volusia County Sheriff's department came to interview me when I was in the Marion Federal Prison in Illinois. I gave them detailed, truthful statements of what I could remember at that time. At some point at a later date I remembered some more details and I wrote them back to explain the details to them. They wrote me back and told me to "not worry about it."

*739 6. Because I was with Michael Walsh before and after the incident, I knew how he was acting and I think there is a good chance that he committed the murder of Brenda Rucker.
On the basis of this affidavit, Swafford filed, along with his motion for rehearing, a motion to relinquish jurisdiction and hold appeal in abeyance in light of newly discovered evidence. In an order dated June 1, 1994, we denied Swafford's motion for relinquishment and motion for rehearing.
On June 13, 1994, Swafford filed a third motion for postconviction relief, alleging that Lestz's affidavit constituted newly discovered evidence[4] which, in conjunction with the evidence previously withheld by the State, proved a Brady violation and furthermore established Swafford's innocence. The trial court summarily denied the motion without an evidentiary hearing. The trial court's decision is now before us for review.
We reject Swafford's Brady claim because, as we recognized in Swafford's first motion for postconviction relief, the State was not required to provide to defense counsel every piece of information regarding other suspects. Swafford, 569 So.2d at 1267. The introduction of Lestz's statement does not alter that conclusion. However, Lestz's statement places Walsh at the Shingle Shack with a .38 caliber handgun at or near the time that the murder weapon was discovered in that locale. We find this evidence, when viewed in conjunction with the evidence alleged in Swafford's prior 3.850 motion and the conflicting evidence presented in Swafford's original trial with regard to exactly where within the bar the gun was found,[5] is sufficient to warrant an evidentiary hearing on the issue of whether the statement is of such a nature that it would probably produce an acquittal on retrial. See Jones v. State, 591 So.2d 911 (Fla.1991).
We accept as sufficient for the purpose of demonstrating that an evidentiary hearing is required, Swafford's claim that Lestz's statement amounts to newly discovered evidence. Our acceptance is based in part on the State's failure to assert, with regard to this issue, anything more than an allegation that defense counsel had years to find Lestz.
We specifically hold, however, that our acceptance of Swafford's claim in this regard does not mean Lestz's statement is newly discovered evidence as a matter of law. Rather, Swafford's newly discovered evidence claim remains to be factually tested at the evidentiary hearing. Accordingly, we direct the trial court on remand to determine whether Swafford has demonstrated as a threshold requirement that his untimely and successive motion for postconviction relief was filed within two years of the time when Lestz's statement could have been discovered through the exercise of due diligence. See Bolender v. State, 658 So.2d 82 (Fla.), cert. denied, ___ U.S. ___, 116 S.Ct. 12, 132 L.Ed.2d 896 (1995). If the trial court determines that Lestz's statement is newly discovered evidence, it must then determine whether the statement, in conjunction with the evidence introduced in Swafford's first rule 3.850 motion and the evidence introduced at trial, would have probably produced an acquittal.
We direct that the continued proceedings in this case be expedited. The trial court is directed to hold an evidentiary hearing within ninety days of the date this opinion becomes final.
It is so ordered.
KOGAN, C.J., and OVERTON, SHAW and GRIMES, JJ., concur.
HARDING, J., concurs specially with an opinion, in which KOGAN, C.J., and SHAW and ANSTEAD, JJ., concur.
*740 ANSTEAD, J., concurs specially with an opinion, in which KOGAN, C.J., and SHAW, J., concur.
WELLS, J., concurs in part and dissents in part with an opinion.
HARDING, Justice, specially concurring.
I concur with the majority opinion and write separately only to comment on the issue of finality raised by Justice Wells in his opinion concurring in part and dissenting in part. Justice Wells is correct in his expressed concern regarding the importance of finality in legal proceedings. The doctrine of finality is a necessary and strong thread that runs through the fabric of our judicial system. Without finality, the affairs of a free society and the rights of its citizens would be severely jeopardized. Thus, I believe that the doctrine of finality should be given great deference and should be an important consideration in determining whether a proceeding will be reopened or overturned.
However, in recognition of the "qualitative difference of death from all other punishments," our jurisprudence also embraces the concept that "death is different" and affords a correspondingly greater degree of scrutiny to capital proceedings. California v. Ramos, 463 U.S. 992, 998-999, 103 S.Ct. 3446, 3451-3452, 77 L.Ed.2d 1171 (1983); see also Ford v. Wainwright, 477 U.S. 399, 411, 106 S.Ct. 2595, 2602, 91 L.Ed.2d 335 (1986) (Marshall, J., plurality opinion). Such heightened scrutiny ensures, as much as is humanly possible, that only those who are legally subject to execution are executed. However, because human decisions are subject to error, some individuals may be wrongly convicted. Thus, the concept of finality must sometimes yield to the fact that "execution is the most irremediable and unfathomable of penalties." Ford, 477 U.S. at 411, 106 S.Ct. at 2602 (Marshall, J., plurality opinion).
While "[u]sing `newly discovered evidence' as a basis to attack a judgment [may be] inherently inconsistent with the concept of finality," opinion concurring in part, dissenting in part at 742, it is an inconsistency that comports with fairness in certain circumstances. Where a defendant presents newly discovered evidence that "would probably have changed the verdict or finding of the court" and "could not with reasonable diligence have [been] discovered and produced at trial," he or she is entitled to a new trial. Fla. R. Crim. P. 3.600(a)(3). Clearly a defendant is only entitled to a new trial where the requirements of rule 3.600(a)(3) are satisfied. However, I would not permit the doctrine of finality to trump the opportunity of a death-sentenced defendant to have a claim of newly discovered evidence reviewed by a court to determine its merits where the claim is properly brought.[6]
Justice Wells states that "capital defendants spend an incessant amount of time on death row without a final adjudication of their cases." Opinion concurring in part, dissenting in part at 742. In an effort "[t]o assure that death penalty proceedings proceed in a more orderly manner" and thereby shorten delays in the death penalty postconviction relief process, this Court reduced from two years to one year the time period in which a death-sentenced prisoner may file motions and petitions for postconviction or collateral relief. See In re Rule Criminal Procedure 3.851, 626 So.2d 198, 198 (Fla. 1993); Fla. R. Crim. P. 3.851(b).[7] When this Court grants extensions for filing briefs in death penalty cases, the parties must adhere strictly to the time period granted. We have even directed a circuit judge to cite a court reporter for contempt for failing to timely *741 file transcripts in a trial where the death penalty was imposed. Congress has also attempted to resolve lengthy delays in the postconviction process by imposing a one-year limitation on the time in which a prisoner may seek federal habeas corpus relief. See Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 101, 110 Stat. 1214, 1217 (to be codified at 28 U.S.C. § 2244(d)).
Even with such limits, I recognize that the postconviction process still may appear inordinately long to the general public in some cases. However, neither public perception nor the reality of a lengthy postconviction process justifies foreclosing meritorious claims of newly discovered evidence. While finality is important in all legal proceedings, its importance must be tempered by the finality of the death penalty.
KOGAN, C.J., and SHAW and ANSTEAD, JJ., concur.
ANSTEAD, Justice, specially concurring.
I concur in the separate opinion of Justice Harding. I also concur in the remand for an evidentiary hearing on the Brady claim and the allegations of newly discovered evidence on this issue. All of Swafford's previous petitions have been summarily denied without hearing despite his allegations of the existence of substantial evidence that the murder may have been committed by another. There has never been an evidentiary hearing to resolve this issue.
At the center of appellant's present claim is a sworn affidavit by the witness Lestz which contains evidence that another person may have committed the crime, and that this information was previously disclosed to the police. The contents of this affidavit, especially when viewed in light of the substantial evidence previously alleged and submitted on this issue, merits a full evidentiary hearing in which this matter can be fairly considered and resolved. See Kyles v. Whitley, ___ U.S. ___, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); Scott v. State, 657 So.2d 1129 (Fla.1995).
The State cannot avoid an evidentiary hearing on the basis that it had no obligation to provide the defense "every piece of information regarding other suspects." The State's obligation under Brady is undisputed. What remains is for an evidentiary hearing to be conducted to determine if there is actual merit to the claims presented.
KOGAN, C.J., and SHAW, J., concur.
WELLS, Justice, concurring in part and dissenting in part.
If the trial court's summary denial of Swafford's 3.850 motion must be reversed and remanded for an evidentiary hearing, I agree that the factual issue of whether Lestz's affidavit amounts to newly discovered evidence should be determined by the trial court. When this Court orders an evidentiary hearing based upon newly discovered evidence in an affidavit, our decision should be construed only as finding that the defendant made a prima facie showing that the evidence therein was newly discovered. The factual determination of whether the affidavit contains newly discovered evidence should be left to the trial court. This is especially true in Swafford's case where the material received by his counsel in 1990 and upon which Swafford based his original 3.850 motion contains the address and phone number of Lestz's brother. Neither Lestz's affidavit nor Swafford himself explains why Lestz could not have been located through his brother. Clearly, if an evidentiary hearing is warranted here, the trial court should be permitted to question Swafford regarding this information and then make its own determination on the issue based upon the evidence presented.
I do not agree, however, that an evidentiary hearing is necessary. Consistent with the views I expressed in my dissent in Roberts v. State, 678 So.2d 1232 (Fla.1996), I find that as a threshold requirement for obtaining postconviction relief based on newly discovered evidence, Swafford bears the burden of establishing a prima facie case that Lestz's affidavit contains newly discovered evidence. To meet this burden, Swafford must demonstrate that the evidence in Lestz's affidavit was unknown to him or his attorney at the time of trial and could not have been ascertained by the exercise of due diligence. Fla. R. Crim. P. 3.850(b); see also Jones v. State, *742 591 So.2d 911 (Fla.1991); Hallman v. State, 371 So.2d 482 (Fla.1979). Swafford must also show why the evidence was not discovered two years prior to the filing of this motion. Fla. R. Crim. P. 3.850; Adams v. State, 543 So.2d 1244 (Fla.1989).
It is my view that this Court should not recognize evidence that a defendant claims is newly discovered as a basis for postconviction collateral relief unless the Court finds after stringent testing that the defendant met this threshold requirement. To do otherwise severely erodes the concept of finality, which this Court has expressly recognized as fundamental to the integrity of our judicial system. In our judicial system, the trial has always been and must continue to be the climactic event in which the facts are determined and the truth established. Jurors have been repeatedly told that the meaning of the Latin derivative for the word "verdict" is "truly said" and that what they are called upon to do by their verdict is speak the truth of the case. In Witt v. State, 387 So.2d 922 (Fla.), cert. denied, 449 U.S. 1067, 101 S.Ct. 796, 66 L.Ed.2d 612 (1980), this Court stated:
The importance of finality in any justice system, including the criminal justice system, cannot be understated. It has long been recognized that, for several reasons, litigation must, at some point, come to an end. In terms of the availability of judicial resources, cases must eventually become final simply to allow effective appellate review of other cases. There is no evidence that subsequent collateral review is generally better than contemporaneous appellate review for ensuring that a conviction or sentence is just. Moreover, an absence of finality casts a cloud of tentativeness over the criminal justice system, benefiting neither the person convicted nor society as a whole.
Id. at 925. The Court in Witt further added that "[i]nroads on the concept of finality tend to undermine confidence in the integrity of our procedures." Id. (quoting United States v. Addonizio, 442 U.S. 178, 184 n. 11, 99 S.Ct. 2235, 2240 n. 11, 60 L.Ed.2d 805 (1979)).
Using "newly discovered evidence" as a basis to attack a judgment is inherently inconsistent with the concept of finality, for which this Court clearly has acknowledged respect. Applying anything but a stringent test to determine whether evidence is actually newly discovered decimates the concept of finality. As a result, trials become but one incidental step along a path of ever changing facts, and capital defendants spend an incessant amount of time on death row without a final adjudication of their cases.[8] To prevent the continued decimation of finality, this Court should adhere to a narrow construction of what is newly discovered evidence for purposes of a 3.850 motion. The need to narrowly define newly discovered evidence follows from this Court's decision in Jones v. State, 591 So.2d 911 (Fla.1991). In Jones, this Court receded from the conclusiveness test for newly discovered evidence reaffirmed in Hallman v. State, 371 So.2d 482 (Fla. 1979),[9] and adopted the same probability test that is set forth in Florida Rule of Criminal Procedure 3.600(a)(3).[10] As a result of Jones, the ten-day time limit for filing a motion for new trial set forth in Florida Rule of Criminal Procedure 3.590(a) is rendered meaningless unless courts stringently test what is *743 alleged to be "newly discovered evidence."[11]
I conclude that Swafford failed to meet the burden associated with newly discovered evidence because he did not make a prima facie showing that he used due diligence in obtaining Lestz's affidavit. Swafford asserts his defense counsel was unable to find Lestz through the use of due diligence prior to his first 3.850 motion because the material disclosed by the State pursuant to chapter 119, Florida Statutes (1989), did not contain information sufficient to obtain Lestz's address. In an affidavit on which Swafford relies, one attorney stated, "I personally sifted through those reports looking for an address and/or phone number that could be used to contact any one of the three. However, nothing panned out." Swafford also asserts that counsel's attempts to locate Lestz through credit and prison records were unsuccessful. Swafford, however, does not specifically indicate in this third motion for postconviction relief who, other than credit companies and prisons, he tried to contact in an attempt to locate Lestz; whether he successfully contacted anyone that had information as to Lestz's whereabouts; or whether anyone contacted provided information regarding Lestz. Nor did he explain why Lestz could not be contacted through his brother.
Furthermore, Swafford admits that Global Tracing Services, Inc., was able to locate Mr. Lestz in April of 1994. He does not explain, however, how Global Services located Lestz. Nor does he explain why the method used to locate Lestz could not have been used at an earlier date.
The allegations in Swafford's motion clearly do not meet the stringent test for newly discovered evidence. I would therefore affirm the trial court's denial of the motion without an evidentiary hearing.
Finally, I find that even if Lestz's affidavit is considered newly discovered evidence, it is not of such a nature that it would probably produce an acquittal on retrial. See Jones, 591 So.2d at 915 (setting standard of review for claims based on newly discovered evidence). Lestz was questioned extensively by police about his potential involvement in the Rucker murder. The police reports containing these interviews demonstrate that Lestz made several contradictory statements to investigators. Some of those statements pertained to the weapons Walsh allegedly owned, including several .38 caliber handguns, and how he allegedly disposed of them. These particular statements, in addition to being contradictory to each other in some respects, conflict with Lestz's affidavit because they do not contain any reference to the Shingle Shack or Walsh's disposal of the gun there.
This Court previously recognized that the evidence against Swafford in this case was substantial. Crucially, the testimony of the couple from whom the murder weapon was stolen a few months before the murder proved the gun came from Nashville, Tennessee. Swafford lived in Nashville and travelled from Nashville to Volusia County just prior to the murder. Additionally, a waitress testified that she actually saw Swafford dispose of a gun inside the Shingle Shack prior to his arrest. One arresting officer testified that while he was at the Shingle Shack, three men positively identified Swafford as the man who had pointed a gun at them during an alleged robbery that occurred outside the Shingle Shack that night.
Nothing in the police reports or in Lestz's affidavit places Walsh in or around Nashville near the time the gun was stolen or at any other time. Furthermore, a close reading of Lestz's affidavit indicates Lestz did not say Walsh actually disposed of a .38 caliber handgun at the Shingle Shack. In fact, Lestz's cleverly worded affidavit does not indicate that Lestz saw Walsh get rid of a gun anywhere. Without the crucial link between Walsh and the murder weapon, I simply do not find a basis upon which to conclude that the evidence offered by Lestz will probably *744 lead to Swafford's acquittal on retrial. I therefore conclude that Swafford is not entitled to an evidentiary hearing.
NOTES
[1] Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
[2] Lestz indicated that Walsh admitted committing three murders while in Florida and that one of the three victims was a white female. Additionally, Lestz placed Walsh, a day before the murder, at a laundromat located only a block from the convenience store where the victim was abducted. According to Lestz, Walsh had on occasion picked him up or dropped him off in this same area. Lestz also told investigators that Walsh and another man, Walter Levi, left him at a hotel in the Daytona Beach area at 6 a.m. on the day of Rucker's murder and that he did not know where they went. When questioned by investigators, Levi indicated that it was Lestz and Walsh who left the hotel together that morning.
[3] As further proof that Walsh resembled the composite, Swafford alleged in his 3.850 motion that the police reports contained a record of an anonymous call indicating that someone matching the composite was seen at a lounge which Lestz told investigators he and Walsh had visited.
[4] Swafford maintains that Lestz's affidavit is newly discovered evidence because despite due diligence, collateral counsel was unable to locate Lestz until an investigating service obtained his address in April 1994. According to Swafford, none of the material disclosed by the State contained a current address for Lestz or information sufficient to determine his current address.
[5] One witness testified that he procured the gun later identified as the murder weapon from a wastepaper basket in the men's room and handed it to the police. Another testified that she saw Swafford hide the gun in a wastepaper basket in the women's room.
[6] To qualify as newly discovered evidence, "the asserted facts `must have been unknown by the trial court, by the party, or by counsel at the time of trial, and it must appear that defendant or his counsel could not have known them by the use of diligence.'" Jones v. State, 591 So.2d 911, 916 (Fla.1991) (quoting Hallman v. State, 371 So.2d 482, 485 (Fla.1979)).
[7] The commentary to Florida Rule of Criminal Procedure 3.851 provides that the proceedings and grounds for postconviction relief remain the same as those provided in Florida Rule of Criminal Procedure 3.850, including "the opportunity for a defendant to present newly discovered evidence in accordance with [recent decisions of this Court]." Fla. R. Crim. P. 3.851 (commentary) (citations omitted). Thus, even in attempting to shorten the postconviction process, this Court recognized the importance of a claim of newly discovered evidence.
[8] I take notice of Florida Department of Corrections' material which states that prisoners who have been sentenced to death are maintained in a six- by nine-foot cell with a ceiling nine and one-half feet high. See Florida Department of Corrections, An Information Services Fact Sheet (June 1994). These prisoners are taken to the exercise yard for two-hour intervals twice a week. Otherwise, these prisoners are in their cells except for medical reasons, legal or media interviews, or to see visitors (allowed to visit from 9 a.m. to 3 p.m. on weekends only). These facilities and procedures were not designed and should not be used to maintain prisoners for years and years.
[9] Hallman provided that in order to provide relief, the newly discovered evidence must be of such a nature that, if known at trial, it would have conclusively prevented the entry of judgment. 371 So.2d at 485.
[10] Florida Rule of Criminal Procedure 3.600(a)(3) provides that new and material evidence shall serve as grounds for a new trial if the defendant could not with reasonable diligence have discovered and produced the evidence at trial, and if introduced at trial, the evidence would probably have changed the verdict or finding of the court.
[11] One consequence of the Jones decision that arises when we fail to stringently test what is "newly discovered evidence" is that stale evidence is given equal weight to evidence presented at the original trial. The evidence presented at trial should be considered more reliable by reason of its proximity in time to the precipitating event. I believe that Chief Justice Rehnquist was correct to observe that "the passage of time only diminishes the reliability of criminal adjudications." Herrera v. Collins, 506 U.S. 390, 403, 113 S.Ct. 853, 862, 122 L.Ed.2d 203 (1993).