980 So.2d 451 (2007)
Wayne TOMPKINS, Appellant,
v.
STATE of Florida, Appellee.
No. SC06-277.
Supreme Court of Florida.
May 10, 2007.
Rehearing Denied July 16, 2007.
*452 Neal Dupree, Capital Collateral Regional Counsel, Fort Lauderdale, FL, and Martin J. McClain of Backhus and Izakowitz, P.A., Special Assistant CCRCSouth, Wilton Manors, FL, for Petitioner.
Bill McCollum, Attorney General, Tallahassee, FL, and Robert J. Landry, Assistant Attorney General, Tampa, FL, for Respondent.
PER CURIAM.
Wayne Tompkins, a prisoner under sentence of death, appeals an order of the circuit court denying his second successive motion for postconviction relief. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. The issue is whether the circuit court erred in summarily denying Tompkins' claim that new information that impeaches a portion of an important witness's trial testimony requires reversal of the conviction and sentence of death. For the reasons that follow, we affirm the trial court's order.

FACTS AND PROCEDURAL HISTORY
In 1985, Tompkins was convicted of the first-degree murder of fifteen-year-old Lisa DeCarr and was sentenced to death on the recommendation of a unanimous jury. Lisa disappeared from her home in Tampa on March 24, 1983. In June 1984, her skeletal remains, along with her pink bathrobe and jewelry, were found in a shallow grave under her house. In September 1984, Tompkins, the boyfriend of Lisa's mother, was charged with the murder.
The State presented "three key witnesses" at trialBarbara DeCarr, Lisa's mother, Kathy Stevens, Lisa's friend, and Kenneth Turco, a jailhouse informant. Tompkins v. State, 502 So.2d 415, 417 (Fla. 1986) ("Tompkins I"). Kathy Stevens, whose testimony is at issue in Tompkins' current motion, testified at trial that she went to Lisa's house between eight and nine o'clock on the morning of March 24, 1983. After hearing a loud crash, she opened the front door and saw Lisa on the couch struggling and hitting Tompkins who was on top of her attempting to remove her clothing. Lisa asked her to call the police but Stevens did not do so. Stevens explained that after she left Lisa's house, she walked to the corner store where she ran into Lisa's boyfriend, James *453 Davis.[1] Stevens stated that she told Davis what she had witnessed but Davis seemed unconcerned. Because she was scared and Davis "walked away like it was nothing," Stevens just went to school. When Stevens returned to Lisa's house later that day to retrieve her purse, Tompkins answered the door and told her that Lisa had left with her mother. Stevens also testified that Tompkins made sexual advances towards Lisa on two previous occasions.
Mrs. DeCarr's and Turco's testimony was summarized by this Court on direct appeal as follows:
Barbara DeCarr . . . testified that she left the house on the morning of March 24, 1983, at approximately 9 a.m., leaving Lisa alone in the house. Lisa was dressed in her pink bathrobe. Barbara met Wayne Tompkins at his mother's house a few blocks away. Some time that morning, she sent Tompkins back to her house to get some newspapers for packing. When Tompkins returned, he told Barbara that Lisa was watching television in her robe. Tompkins then left his mother's house again, and Barbara did not see or speak to him again until approximately 3 o'clock that afternoon. At that time, Tompkins told Barbara that Lisa had run away. He said the last time he saw Lisa, she was going to the store and was wearing jeans and a blouse. Barbara returned to the Osborne Street house where she found Lisa's pocketbook and robe missing but not the clothes described by Tompkins. Barbara then called the police.
. . . .
Kenneth Turco . . . testified that Tompkins confided details of the murder to him while they were cellmates in June 1985. Turco testified that Tompkins told him that Lisa was on the sofa when he returned to the house to get some newspapers for packing. When Tompkins tried to force himself on her, Lisa kicked him in the groin. Tompkins then strangled her and buried her under the house along with her pocketbook and some clothing (jeans and a top) to make it appear as if she had run away.
Id. at 417-18. Tompkins did not present any evidence and the jury found him guilty of first-degree murder. See id. at 418.
At the penalty phase, the State presented evidence that Tompkins had been convicted of kidnapping and rape stemming from two separate incidents in Pasco County that occurred after Lisa's disappearance. Tompkins presented testimony regarding his good work record, shy and nonviolent personality, and honesty. See id. The jury recommended death by a vote of twelve to zero and the trial court imposed a sentence of death. This Court affirmed the conviction and death sentence. See id. at 421.
Beginning with his initial motion for postconviction relief filed in March 1989, Tompkins has asserted that the State withheld exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), that impeaches Stevens' trial testimony. In his first postconviction motion, Tompkins alleged that the State failed to disclose file memoranda prepared by prosecutor Michael Benito in which he memorialized two conversations with Stevens that were inconsistent with her trial testimony. The inconsistencies Tompkins identified were: (1) the difference in the time of Stevens' observation of the assault on the day Lisa disappeared;[2] (2) Stevens' statement at *454 trial that Lisa asked her to call the police was not mentioned in Benito's memo; and (3) Stevens' testimony that during Tompkins' prior assault on Lisa five months before the murder, Tompkins commented that he was going to kill Lisa, was different than her statement to Benito that Tompkins threatened to kill Lisa if she ever hit him again.[3] Tompkins also alleged that the State failed to disclose that at the time Stevens first told Benito that she had witnessed Tompkins attacking Lisa, which occurred two years after Lisa's disappearance, Benito arranged for Stevens to visit her boyfriend in jail.
After an evidentiary hearing, the circuit court denied all of Tompkins' Brady claims without discussion. On appeal, this Court affirmed without specifically addressing the claims related to Stevens. See Tompkins v. State, 549 So.2d 1370, 1372 (Fla. 1989) ("Tompkins II").
In a federal habeas petition, Tompkins raised the same Brady claims regarding the inconsistencies in Stevens' statements and the fact that Benito arranged for Stevens to visit her boyfriend in jail. Regarding Benito's file memoranda, the federal district court found that
[e]ven assuming that [memoranda] qualif[y] as evidence covered by the Brady rule, there is no reasonable probability that availability of such evidence, either separately or collectively, would have changed the outcome of the trial. It cannot reasonably be said that [Tompkins] was denied a fair trial as a result of the prosecuting attorney's failure to affirmatively disclose these materials.
Tompkins v. Singletary, No. 89-1638-CIV-T-99B, 1998 U.S. Dist. LEXIS 22582, *38 (M.D.Fla. Apr. 17, 1998). In reaching this conclusion, the district court noted that "at the 3.850 evidentiary hearing, Benito testified that his two memoranda to his file did not purport to recite all the details of what Kathy Stevens told him during his telephone conversations with her." Id. at *38 n. 13.
Addressing Tompkins' claim that the State violated Brady by failing to disclose that Benito assisted Stevens in arranging a visit with her boyfriend, the district court found that "[a]ssuming arguendo that this is something that should have been disclosed to the jury, such failure can hardly be regarded as implicating such gravity as would put the case in a different light or undermine confidence in the verdict." Id. at *39. The Eleventh Circuit affirmed the district court's denial of these claims without discussion. See Tompkins v. Moore, 193 F.3d 1327, 1331 n. 1 (11th Cir.1999) ("Tompkins III").
On March 22, 2001, after Governor Bush signed Tompkins' third death warrant, Tompkins filed a second postconviction motion in state court. In this motion, Tompkins asserted, among other claims, that the State failed to disclose favorable evidence in violation of Brady that demonstrated *455 that the testimony of the State's three key witnesses and the State's closing arguments were false in violation of Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). See Tompkins v. State, 872 So.2d 230 (Fla.2003) ("Tompkins IV"). Specifically, Tompkins alleged that the State withheld several police reports and other documents which he claimed contained (1) statements that tended to contradict the testimony of Mrs. DeCarr, Stevens, and Turco, (2) information about other possible suspects, (3) information about a police investigation into the disappearance of one of Lisa's friends that was being investigated in conjunction with the DeCarr case, and (4) information related to the credibility of Stevens and Turco. Id. at 238. The circuit court denied the motion and this Court affirmed. See id. at 233. Regarding Tompkins' Brady claim, this Court concluded that "[e]ither the undisclosed documents are not Brady material because they are neither favorable to Tompkins nor suppressed, or Tompkins has not demonstrated that he was prejudiced by the lack of disclosure." Id. at 241.
Tompkins' current motion, which was filed in accord with this Court's decision in Tompkins v. State, 894 So.2d 857, 858-59 (Fla.2005) ("Tompkins V"),[4] alleges that new information provided by James Davis, Lisa's boyfriend at the time of her disappearance, significantly impeaches the testimony of Kathy Stevens and requires reversal of the conviction and death sentence. Specifically, Davis stated that he did not see Stevens at the corner store on the morning Stevens witnessed Tompkins assaulting Lisa. In April 2002, Davis made the following statements in a sworn affidavit:
1. My name is James M. Davis, Jr., and I currently reside in Hillsborough County Florida.
2. At the time that Lisa DeCarr disappeared, she was my girlfriend. We were both pretty young at the time, but I cared about her very much.
3. Lisa and I would hang out most of the time. I did not drive at that time. I would ride my bike over to her house and we would hang out around the neighborhood. At first, I thought that I might like to date Lisa's older sister, Sue, but it ended up that I had feelings for Lisa. We met going to school when I was in 6th or 7th grade. Everyday a group of us would walk to and from school through a pretty rough neighborhood.
4. Lisa would talk to me about not being happy living at home. Her mother always had a lot of men around and Lisa did not like that. She took care of her younger brothers a lot of the time. She never talked about her relationship with Wayne Tompkins; she never said that he attacked her, or that there was any violent contact between them. I do not remember Lisa ever having any cigarette burns on her chest or anywhere else on her body.

*456 5. I remember that there were some friends of Lisa's that did hang around. I do not remember Kathy Sample, Stevens, or Mamroe being a close friend of Lisa's.
6. At the time when Lisa disappeared I was working for National Utilities Cable Company. We laid underground cable for telephones. I had to be at work every morning by 7:00 am. The story of Kathy running into me at the store the day Lisa disappeared is not true. If anyone had told me that Wayne was attacking Lisa and she was screaming for someone to call the police, I would have gone directly there. Also, I never went to work drunk, I am not a big drinker, and I was never drunk at 7:00 in the morning at work. It never happened.
7. I was very upset about Lisa being missing. She was very special to me, I did want to go and look for her when I found out, but my parents wanted me to stay out of it.
8. I only remember talking to the police once, I am very sad about what happened to Lisa DeCarr. If I thought there was anyway I could have helped her, I would have, especially if she were in trouble. This is why what Kathy said is not true. I never saw Kathy on the morning that Lisa disappeared, nor did Kathy ever tell me that she had just seen Lisa being attacked by Wayne. In fact, the first time I heard of anything having possibly happened to Lisa was when I heard on the radio she was missing.
Tompkins alleged that his counsel attempted but failed to locate Davis in 1989 and had no indication that Davis possessed any relevant information until he received new documents from the State in April 2001. Tompkins specifically referred to two lead sheets prepared by Detective Burke, the lead detective on the case, and a police report dated June 8, 1984, both of which Tompkins alleged that the State withheld in violation of Brady in his prior successive motion for postconviction relief. See Tompkins IV, 872 So.2d at 238 n. 12.
After ordering a response from the State and holding a Huff[5] hearing to determine whether an evidentiary hearing was required, the circuit court issued an order denying Tompkins' motion. The circuit court evaluated Tompkins' claim as one of newly discovered evidence and found that Tompkins failed to both timely raise the claim and establish that Davis's affidavit was of such a nature that it would probably produce an acquittal at retrial. Regarding the merits of Tompkins' claim, the circuit court ruled that
[n]othing that Defendant presented in the hearing on August 29, 2005 leads the Court to believe that if the evidence as presented in the affidavit from Junior Davis was taken as true, the outcome at trial would have been any different. Kathy Stevens was subjected to staunch cross examination and the fact that as counsel for Defendant alleges, there might have been more material upon which to challenge her recollection of the facts of the case is insufficient in and of itself to vacate the judgment in this case.

ANALYSIS
Initially, Tompkins argues that the circuit court erred in evaluating his claim regarding Davis's affidavit under the newly discovered evidence standard of Jones v. State, 591 So.2d 911, 916 (Fla. *457 1991), rather than as a claim under Brady and Giglio because the State allegedly withheld the evidence that indicated that Davis was an important witness and presented Stevens' false testimony. Davis's statement itself was not suppressed by the State[6] and Tompkins has presented no evidence that the State knowingly presented false testimony.[7] Accordingly, we conclude that the trial court correctly evaluated Tompkins' claim as one of newly discovered evidence.
Turning to the merits of Tompkins' claim, the circuit court denied Tompkins' motion without an evidentiary hearing. Thus, we "must accept all allegations in the motion as true to the extent they are not conclusively rebutted by the record." Hodges v. State, 885 So.2d 338, 355 (Fla. 2004) (quoting Gaskin v. State, 737 So.2d 509, 516 (Fla.1999)); see also Fla. R.Crim. P. 3.850(d) (providing that the motion shall be denied without an evidentiary hearing if "the motion, files, and records in the case conclusively show that the movant is entitled to no relief"); Fla. R.Crim. P. 3.851(f)(5)(B) (providing that a successive postconviction motion in a capital case may be denied without an evidentiary hearing if "the motion, files, and records in the case conclusively show that the movant is entitled to no relief").
To have his conviction set aside based on newly discovered evidence, Tompkins must satisfy the two-prong test set forth in Jones. First, the "asserted facts `must have been unknown by the trial court, by the party, or by counsel at the time of trial, and it must appear that defendant or his counsel could not have known them by the use of diligence.'" Jones, 591 So.2d at 916 (quoting Hallman v. State, 371 So.2d 482, 485 (Fla. 1979)). Second, "the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial." Id. at 915.
The circuit court found, and the State argues, that Tompkins' claim is untimely because Davis was listed in police reports provided to the defense prior to trial. We do not address the timeliness of Tompkins' claim because we affirm the trial court's denial of relief based on the second prong of Jones.
In determining whether the discovery of new evidence compels a new trial, the trial court was required to "consider all newly discovered evidence which would be admissible," and "evaluate the weight of both the newly discovered evidence and the evidence which was introduced at the trial." Id. at 916. This determination includes
whether the evidence goes to the merits of the case or whether it constitutes impeachment evidence. The trial court should also determine whether the evidence is cumulative to other evidence in the case. The trial court should further consider the materiality and relevance of the evidence and any inconsistencies in the newly discovered evidence.
Jones v. State, 709 So.2d 512, 521 (Fla. 1998) (citations omitted).
*458 There is no question that Stevens was a very important witness at trial. Her testimony that she witnessed Tompkins assaulting Lisa on the day Lisa disappeared, if believed by the jury, was strong circumstantial evidence of Tompkins' guilt. And the State emphasized the significance of her testimony during closing arguments. Thus, the impeachment evidence in Davis's affidavit cannot be viewed as insignificant. However, we conclude that this impeachment evidence, when considered with the other evidence presented at trial, is not of "such nature that it would probably produce an acquittal on retrial." Jones, 591 So.2d at 915.
The impeachment evidence included in Davis's affidavit is much different than the undisclosed interviews at issue in Cardona v. State, 826 So.2d 968, 981 (Fla.2002), which this Court determined required a new trial under Brady. In that case, the witness was the codefendant involved in the abuse and murder of the defendant's three-year-old son. See id. at 969-70. We described this witness as "the most important witness to testify as to which of the two defendants was the more culpable, and to the escalating abuse the State claimed [the defendant] committed against [the victim]." Id. at 974. The witness was also "the only witness who testified to the significant events of the day preceding [the victim's] death and the day of [the victim's] death." Id. After trial, the defense learned that the State failed to disclose three interviews and a report that contained statements from the witness that contradicted her trial testimony on these central issues. We concluded that the defendant was entitled to a new trial because the undisclosed interviews with the witness "contain[ed] material inconsistencies on several key points not addressed at trial that could have seriously undermined [the witness's] credibility," id., and suggested coaching by the State. Id. at 980-81.
In this case, Davis's affidavit contradicts Stevens' testimony regarding her encounter with Davis at the corner store, which Stevens indicated was part of the reason she did not call the police. However, his statements do not address Stevens' testimony that she saw Tompkins attacking Lisa.
Further, Stevens, who was fifteen when she witnessed the assault and seventeen at the time of trial, was significantly impeached by defense counsel. She waited almost a year to come forward after Lisa's body was discovered and made previous statements to the prosecutor and Mrs. DeCarr that she had no information about Lisa's disappearance. The State's argument to the jury regarding Stevens' credibility in the face of this impeachment was that Stevens had no reason to lie. The statements in Davis's affidavit do not provide any new information that suggests that Stevens did, in fact, have a motive to lie. Cf. Cardona, 826 So.2d at 981 (noting that a crucial witness's inconsistent version of "critical events . . . `would have introduced a new source of bias'") (quoting United States v. Rivera Pedin, 861 F.2d 1522, 1530 (11th Cir.1988)).
Davis's affidavit is not the type of evidence this Court has held requires an evidentiary hearing to determine whether it would probably produce an acquittal. This is not a case in which the defense has credible new evidence that another person may have committed the murder. See Swafford v. State, 679 So.2d 736, 739 (Fla. 1996) (remanding for an evidentiary hearing to determine whether new evidence that placed alternative suspect at a bar with .38 caliber handgun near the time that murder weapon was discovered in that locale, when considered cumulatively with the evidence alleged in Swafford's prior 3.850 motion and the conflicting evidence *459 presented in Swafford's trial with regard to exactly where within the bar the gun was found, was of such a nature to probably produce an acquittal on retrial).
This is also not a case where an important witness has recanted his or her testimony. See Lightbourne v. State, 742 So.2d 238, 249 (Fla. 1999) (remanding for an evidentiary hearing to determine whether newly recanted testimony, when considered cumulatively with all of the post-trial evidence indicated that other witnesses testified falsely, required a new penalty phase hearing). Indeed, none of the State's three "key witnesses"Mrs. DeCarr, Stevens, or Turcohas recanted.
Tompkins' case is more akin to Sims v. State, 754 So.2d 657, 662-63 (Fla.2000), in which the Court affirmed the denial of a newly discovered evidence claim based on hearsay statements that a person other than the defendant committed the crime. The Court noted that the evidence was admissible solely for impeachment purposes, did not place the alternative suspect at the scene of the crime, and did not affect the testimony of the three eyewitnesses who identified the defendant as the perpetrator. See id. at 662. The Court also observed that the defendant had not presented any evidence that directly refuted the State's case. See id. at 662-63.
Finally, even when Davis's affidavit is considered cumulatively with any favorable evidence the State withheld, as alleged in Tompkins' prior two postconviction motions, we conclude that the motions, files, and records show that Tompkins is not entitled to relief under either the materiality prong of Brady or the second prong of Jones.[8] In Tompkins IV, we affirmed the summary denial of Tompkins' Brady claims, concluding that "[e]ither the undisclosed documents are not Brady material because they are neither favorable to Tompkins nor suppressed, or Tompkins has not demonstrated that he was prejudiced by the lack of disclosure." 872 So.2d at 241. We further stated that "even if we were to engage in a cumulative analysis and consider the undisclosed, favorable documents in conjunction with Tompkins' claims raised in his first motion for postconviction relief, our conclusion as to prejudice would not change." Id. at 241-42. We reach the same conclusion in this case.

CONCLUSION
Based on the foregoing, we affirm the trial court's summary denial of Tompkins' second successive motion for postconviction relief.
It is so ordered.
LEWIS, C.J., and WELLS, ANSTEAD, PARIENTE, CANTERO, and BELL, JJ., concur.
QUINCE, J., recused.
NOTES
[1] James Davis is also known as Junior Davis.
[2] Benito's memo states that Stevens saw the struggle between Tompkins and Lisa at 8 a.m. Tompkins asserted in his motion that Stevens testified at trial that this occurred at 9:30. However, Stevens actually testified that she returned to Lisa's house between 8 and 9 a.m., but that she could not be sure of the time.
[3] Stevens testified that on one occasion when she spent the night at Lisa's house, Tompkins attempted to get into bed with them. Her testimony about who Tompkins threatened as he left Lisa's room is ambiguous:

Q [by the prosecutor]: After she dug her nails into him, do you recall Wayne saying anything to Lisa and you at this time?
A [by Stevens]: He was
Q: Speak up please.
A: He was telling her to stop and calling her a bitch and vulgar names.
Q: Did he say anything else?
A: He saidhe looked at me and he said, "I'm going to kill you," and then he looked at Lisa and then he got up, and he looked disgusted and he left the room.
[4] In August 2002, while his appeal in Tompkins IV was pending, Tompkins filed a motion to relinquish jurisdiction to allow the circuit court to consider a claim based on new evidence disclosed by the State in 2001. The Court denied the motion and Tompkins filed another successive postconviction motion in the trial court, alleging new evidence to support his Brady and Giglio claims. The circuit court dismissed the motion, finding that it lacked jurisdiction due to the pending appeal. This Court affirmed the trial court's order but gave Tompkins "60 days to refile his successive postconviction motion nunc pro tunc to February 5, 2003, the date his prior motion was filed in the trial court." Tompkins V, 894 So.2d at 859.
[5] 1. Huff v. State, 622 So.2d 982 (Fla.1993).
[6] To obtain relief under Brady, the defendant must establish: "(1) that the evidence at issue is favorable to him, either because it is exculpatory or because it is impeaching; (2) that the evidence was suppressed by the State, either willfully or inadvertently; and (3) that the suppression resulted in prejudice." Johnson v. State, 921 So.2d 490, 507 (Fla.2005).
[7] To establish a Giglio violation, the defendant must show: "(1) the testimony given was false; (2) the prosecutor knew the testimony was false; and (3) the statement was material." Guzman v. State, 868 So.2d 498, 505 (Fla.2003).
[8] Unlike the second prong of Jones, which requires that the defendant establish that the new evidence is of "such nature that it would probably produce an acquittal on retrial," 591 So.2d at 915, the materiality prong of Brady asks whether the evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Strickler v. Greene, 527 U.S. 263, 290, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999).