695 So.2d 1245 (1997)
Walter Gale STEINHORST, Appellant,
v.
STATE of Florida, Appellee.
No. 86109.
Supreme Court of Florida.
June 5, 1997.
*1246 Stephen D. Alexander and Lisa R. Kiebel of Fried, Frank, Harris, Shriver & Jacobson, Los Angeles, CA, for Appellant.
Robert A. Butterworth, Attorney General and Barbara J. Yates, Assistant Attorney General, Tallahassee, for Appellee.
PER CURIAM.
We review an order denying relief to Walter Gale Steinhorst, a prisoner under three sentences of death.[1] We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
*1247 Steinhorst was convicted on four counts of first-degree murder and sentenced to death for three of those murders.[2] This Court affirmed the convictions and sentences on direct appeal. Steinhorst v. State, 412 So.2d 332 (Fla.1982). Steinhorst's first 3.850 motion alleged, among other issues, Brady[3] and Hitchcock[4] violations. That motion was denied following an evidentiary hearing before Judge W. Fred Turner in 1987.[5] This Court affirmed. Steinhorst v. State, 574 So.2d 1075 (Fla.1991). Steinhorst subsequently filed a second motion for postconviction relief[6] seeking to have the judgment on the first 3.850 hearing rendered null and void due to Judge Turner's undisclosed conflict of interest. Specifically, before becoming a judge, Judge Turner had represented and advised the estate of one of the murder victims. As a result, Judge Turner recused himself from the trial of one of Steinhorst's codefendants, Charles Hughes, after informing Hughes' counsel of the conflict. According to Steinhorst's counsel, neither Judge Turner nor the State disclosed the conflict. Judge Turner's recusal order was first discovered in 1991 during a review of the court case files in preparation for Steinhorst's federal habeas corpus petition.
Judge Don T. Sirmons summarily denied Steinhorst's motion on procedural and substantive grounds. On appeal Steinhorst contended that the recusal order was not found during a 1986 review of the court case files because of clerical error on the part of the clerk's office below. We held that if the information regarding the conflict was not reasonably available to Steinhorst and could not have been ascertained by the exercise of due diligence, then it would qualify as newly discovered evidence sufficient to require a new 3.850 hearing. On the other hand, if the information was reasonably available and Steinhorst did not move to recuse the judge, the right to recuse was waived. Accordingly, we remanded for a factual determination of whether the information regarding Judge Turner's conflict was known by either Steinhorst or his attorney, and if not, whether the information could have been ascertained by the exercise of due diligence. Steinhorst v. State, 636 So.2d 498 (Fla.1994).
Following an evidentiary hearing, Judge Sirmons entered an order denying Steinhorst's motion to set aside the 3.850 judgment entered by judge Turner. The court concluded that while neither Steinhorst nor his attorney had actual knowledge, the fact of Judge Turner's recusal in Hughes' case could have been ascertained by the exercise of due diligence. With respect to the recusal order itself, the court found that Steinhorst's lawyers and their staff simply overlooked the recusal order during their earlier review of the court files in 1986. In support of this finding, the court noted that prior to 1988, all of Steinhorst's and his codefendants' pleadings were kept in one filing system chronologically without reference to an individual defendant's name. According to the court, there was no basis to find that the relevant records had ever been misplaced by the clerk's office.
Steinhorst contends on appeal that the court erred in finding that the recusal order was present in the court files during the 1986 review. At the evidentiary hearing, he presented the testimony of Christian Cox, the paralegal who reviewed the court files in 1986 in preparation for the evidentiary hearing on Steinhorst's first 3.850 motion. Cox testified that she thoroughly reviewed the files and never saw the recusal order. Steinhorst *1248 posits that the recusal order was not in the files given to Cox in 1986. He argues that it was located in the basement vault, to which, according to the State's witness Reena Goss Baker, employees of the clerk's office would not have had access. In support of his argument that the recusal order was in the basement vault back in 1986, Steinhorst notes that the lawyer and paralegal who reviewed the court files in 1991 testified that they found the recusal order in some files that had been brought up from "downstairs" after their repeated requests for additional files.
However, there was also evidence presented suggesting a different explanation for why the Hughes recusal order may have come from the basement vault in 1991. State witness Gloria Tharpe, an employee of the clerk's office, testified that before 1988, all of the paperwork regarding Steinhorst and his codefendants, known as the Sandy Creek files,[7] was kept together in a roughly chronological but otherwise unorganized fashion. She testified that these files were kept in a file room on the first floor next to the clerk's office. Tharpe further testified that in 1988, when it became necessary to prepare the record on appeal for Steinhorst's first 3.850 motion, she reorganized the Sandy Creek files by separating the paperwork according to individual defendant.
Reena Goss Baker corroborated Tharpe's testimony regarding the location of the Sandy Creek files. She testified that between 1985 and 1988, all the pleadings, motions, and orders for all the Sandy Creek defendants were kept on the first floor near the clerk's office. She further testified that only the State's exhibits were kept in the inaccessible basement vault during this time. It was only after the files were organized by individual defendant in 1988 that the files on inactive Sandy Creek defendants were placed in the basement vault.
When the evidence adequately supports two conflicting theories, this Court's duty is to review the record in the light most favorable to the prevailing theory. Johnson v. State, 660 So.2d 637, 642 (Fla.1995), cert. denied, ___ U.S. ___, 116 S.Ct. 1550, 134 L.Ed.2d 653 (1996). Under that standard, we will not alter a trial court's factual findings if the record contains competent substantial evidence to support those findings. We conclude that the evidence in the record supports the trial court's finding that in 1986, when Steinhorst's attorneys were preparing for the first 3.850 evidentiary hearing, the Hughes' recusal order was in the same court file that contained Steinhorst's paperwork. We note that even Cox testified that during her 1986 review of the court files, she recalled seeing documents with the names of Steinhorst's codefendants. Her testimony was not inconsistent with Tharpe's and Baker's testimony that the pleadings of all codefendants were kept together before 1988.
We also find the record contains competent substantial evidence to support the trial court's finding that "at no time did defense counsel seek to talk directly by letter, phone or personally to the defense counsel who handled the Hughes case as to what happened in that case." The following exchange took place during the cross-examination of Stephen Alexander, Steinhorst's primary postconviction counsel:
Q. Did you ever talk to any of the lawyers in the Charlie Hughes, the trial lawyer in Charlie Hughes' case?
A. Mr. Daniels?
Q. Yes.
A. No, I've never talked to him personally. I know that I attempted to reach him and people on mythat working for me attempted to reach him and I believe at the time I was told that he didn't want to cooperate.
Q. When was this?
A. I don't recall specifically. Now, it was sometime during the investigation period. We tried to attempt to reach every lawyer that had ever represented any of the co-defendants.
Q. All right. In the investigation period, do you know which period you're talking about?
A. We made an attempt to reachand sometimes more than one attempt to reach *1249 every lawyer starting from when I got involved in the case probably early in 1983, up and including two weeks ago.
Q. All right.
A. I should say just to be complete, I personally did not talk withMr. Daniels, I believe, did speak with Ms. Jacobs sometime after September [1991].
Contrary to Steinhorst's assertion, Alexander's testimony does not unequivocally establish that he or his staff had attempted to reach Hughes' attorney before Ms. Jacobs did in 1991. Alexander indicated that the investigation period ran from 1983 all the way up until 1994. He testified that he learned that Hughes' lawyer did not wish to cooperate after Jacobs spoke with him in 1991. The trial court's finding that there was no attempt to contact Hughes' attorney clearly refers to the time before 1986, for that is the relevant time period for purposes of determining whether due diligence was exercised. It is irrelevant that Steinhorst's counsel attempted to contact Hughes' lawyer in 1991.
Having upheld the trial court's findings of fact, we conclude that the trial court did not err in denying Steinhorst's motion for relief. Accordingly, we affirm the denial of Steinhorst's second 3.850 motion.
It is so ordered.
OVERTON, GRIMES, HARDING and WELLS, JJ., concur.
KOGAN, C.J., dissents with an opinion, in which SHAW and ANSTEAD, JJ., concur.
ANSTEAD, J., dissents with an opinion, in which KOGAN, C.J. and SHAW, J., concur.
KOGAN, Chief Judge, dissenting.
I dissent from the majority's opinion. As I stated in Steinhorst v. State, 636 So.2d 498, 501 (Fla.1994)(Kogan, J., specially concurring), I believe that the appearance of impropriety created by Judge Turner was so grave as to create fundamental error under the due process clause of the Florida Constitution. Accordingly, I maintain, as I did previously in Steinhorst, 636 So.2d at 501, that a new and impartial judge should hold a new evidentiary proceeding pursuant to Florida Rule of Criminal Procedure 3.850 and this Court's opinion in Steinhorst v. State, 498 So.2d 414, 414-15 (Fla.1986).
In its prior decision remanding for a specific factual determination, the majority recognized that this case raised grave due process concerns. Steinhorst, 636 So.2d at 500-01. Specifically, the majority stated:
A judge who is recused from a codefendant's case also must be recused from another codefendant's case if the reasons for recusal apply equally to both. There is no other conclusion that is consistent with one of the most important dictates of due process: that proceedings involving criminal charges, and especially the death penalty, must both be and appear to be fundamentally fair. As this Court noted in Scull v. State, 569 So.2d 1251, 1252 (Fla.1990):
One of the most basic tenets of Florida law is the requirement that all proceedings affecting life, liberty, or property must be conducted according to due process. Art. I, § 9, Fla. Const.... "[D]ue process" embodies a fundamental conception of fairness that derives ultimately from the natural rights of all individuals. See Art. I, § 9, Fla. Const.
Steinhorst, 636 So.2d at 500-01. Although the majority recognized that due process concerns existed, it concluded that it could address these concerns only under certain limited circumstances. According to the majority, the due process violation could be addressed only if Steinhorst did not waive his claim pursuant to section 38.02, Florida Statutes (1991)[8] and rule 3.850. Steinhorst, 636 So.2d at 500-01.
*1250 The trial court, on remand, determined that Steinhorst waived his right to recuse Judge Turner. With regard to section 38.02, the trial court concluded Steinhorst waived his claim because the information concerning the conflict was reasonably available prior to the date Steinhorst filed his notice of appeal.[9] With regard to rule 3.850, the trial court found that although the information regarding Judge Turner's conflict was not previously known to Steinhorst or his attorney, it could have been ascertained by the exercise of due diligence prior to the expiration of the time limit set by rule 3.850.[10] The trial court thus concluded that the information regarding the conflict did not amount to newly discovered evidence which is necessary to overcome the time limit set by rule 3.850.
The majority opinion in this case affirms the trial court's order and thereby recognizes, as it did in the prior decision, that Steinhorst's due process claim could be waived. As I indicated in my prior opinion, I believe that Steinhorst's particular due process claim is nonwaivable under any construction of the facts. To hold otherwise casts upon the defendant an affirmative duty to investigate a judge's background for the possible sources of conflict. See Lightbourne v. Dugger, 549 So.2d 1364, 1368 (Fla.1989)(Barkett, J., concurring in part, dissenting in part). To impose such a duty is inconsistent with the dictates of our Constitution which, as the majority previously recognized, requires that proceedings involving criminal charges, especially the death penalty, must both be and appear to be fundamentally fair. Accordingly, I cannot agree that Steinhorst waived his claim that Judge Turner's undisclosed conflict of interest required a new 3.850 proceeding before a new and impartial judge.
SHAW and ANSTEAD, JJ., concur.
ANSTEAD, Judge, dissenting.
Imagine the following scenario: this Court reverses a trial judge's summary denial of a death sentenced defendant's petition to set aside his conviction and sentence, and upon remand, the same judge conducts a hearing, but again denies the petition. Later, it is discovered that the judge who conducted the post-conviction proceedings had previously served as the lawyer for the murder victim's estate.[11] Not possible, you say? Certainly not possible in the United States of America, right? Wrong! This incredible sequence of events is the exact scenario approved by the majority today. We should not be parties to such an obvious miscarriage of justice, especially when the only remedy sought is a post-conviction hearing before an unbiased court.
Chief Justice Kogan is obviously right when he describes the blatant appearance of impropriety involved hereby a judge who literally held the power of life or death over the defendant. Here is what we said about this egregious conflict of interest in our earlier opinion:
Steinhorst calls this Court's attention to a fact previously not disclosed to us. Prior to becoming a judge, Judge Turner had represented and advised the estate of one of the victims whom Steinhorst was convicted of killing. This representation included giving counsel to the victim's family and the possibility of pursuing a wrongful *1251 death or other tort claim on behalf of the victim's estate. Judge Turner recognized the potential for serious conflict and entered an order of recusal in the trial of one of Steinhorst's codefendants. No such recusal was ordered here, nor did the judge notify the parties of the potential conflict, even though the reasons for recusal applied equally to both cases.
....
[I]f the relevant records were not reasonably available to Steinhorst and the conflict could not be ascertained by the exercise of due diligence, then the prior recusal would constitute newly-discovered evidence properly cognizable in a 3.850 motion. Moreover, such evidence would present grave due process concerns. A judge who is recused from a codefendant's case also must be recused from another codefendant's case if the reasons for recusal apply equally to both. There is no other conclusion that is consistent with one of the most important dictates of due process: that proceedings involving criminal charges, and especially the death penalty, must both be and appear to be fundamentally fair. As this Court has noted in Scull v. State, 569 So.2d 1251, 1252 (Fla.1990):
One of the most basic tenets of Florida law is the requirement that all proceedings affecting life, liberty, or property must be conducted according to due process. Art. I, § 9, Fla. Const.... "[D]ue process" embodies a fundamental conception of fairness that derives ultimately from the natural rights of all individuals. See art. I, § 9, Fla. Const.
636 So.2d at 500-01. Recently, in Maharaj v. State, 684 So.2d 726, 728 (Fla.1996), we treated a similar situation as follows:
We also find that the ethical conflict issue in this case warrants reversal. Maharaj alleges that he discovered only recently that the trial judge who presided over this rule 3.850 proceeding was, at the time of Maharaj's trial, the supervising attorney of the assistant state attorneys who prosecuted Maharaj. Maharaj contends that he did not discover this information until he was allowed to review portions of the State's files. A specific procedure does exist for moving to disqualify a judge, Rogers v. State, 630 So.2d 513 (Fla.1993), but such a procedure was not followed in this case. Nevertheless, we find that the trial judge should have recused himself from the entire case if he believed he was ineligible to preside over an evidentiary hearing, regardless of whether a motion to disqualify was filed. Canon 3(E), Code of Judicial Conduct (a judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned). Given these unique circumstances, combined with our conclusions that an evidentiary hearing is warranted on at least some of Maharaj's claims, we conclude that this case must be remanded for a full review before a new judge.
We should do no less here.

ETHICS
Ethically, it cannot be disputed that the judge and prosecutor had an obligation to disclose this judge's blatant conflict of interest as well as the fact that the judge had actually recused himself in a codefendant's case because of this same conflict. Under our Canons of Judicial Ethics, a judge is expressly and affirmatively required to disqualify himself under the circumstances presented here.[12]
*1252 There is not one word in the majority opinion about this obligation of the judge and the corresponding obligation of the prosecuting attorney to reveal this conflict and the prior recusal, even though our prior opinion specifically noted that "A judge who is recused from a co-defendant's case also must be recused from another co-defendant's case if the reasons for recusal apply equally to both." 636 So.2d at 500-01. Similarly, there is no explanation in the majority opinion of the source of any duty on the part of the defendant to investigate and discover the trial court's conflict of interest. Indeed, the majority's focus is skewed by the absence of any analysis of the fundamental issue of conflict. This is not a "new evidence" case, where the burden is appropriately placed on the defendant. It is a conflict case involving the fundamental integrity of the post-conviction proceedings and our focus should be on the nature of the conflict and the misconduct of the trial judge in continuing to preside over the case.
In essence, our prior remand focused on whether there might have been a waiver of the right to seek disqualification of the judge, i.e., whether the defendant knew or had reason to know the grounds for disqualification but failed to act. In fact, we cited the statute which requires that disqualification be sought within thirty days of the time that a party has knowledge of the grounds for disqualification. Of course, for there to be even the possibility of a waiver, there must be knowledge of the matter waived. Yet, it is undisputed in this case that there was no knowledge by the defendant of the judge's serious conflict. We are talking about a document that counsel was totally unaware of and had no reason to know existed, much less have reason to search for in another defendant's papers.[13]

NEEDLE IN A HAYSTACK
The "order" here was literally "a needle in a haystack," that we are holding voluntary collateral counsel should have found even sooner than they did. Of course, a defendant cannot ignore what is plainly there for him to see. But there was nothing here for the defendant to "plainly" see. Even under the majority's analysis, it is apparent that the State never refuted defense counsels' account of how and when they finally discovered by chance the recusal order located among papers concerning another defendant's case. In fact, the State verified the incredible mess that the court files were in. In addition, it is undisputed that the "order" in question was not specially titled to reflect its content and was not identified on any court docket, so as to alert a reader of its existence or importance. The bottom line is that these records were a mess, and that counsel exercised great diligence in actually locating something that they should have had no need to even be looking for anywaysomething the court and the State had a moral, ethical and legal obligation to tell the defense about from the beginning.

PRO BONO COUNSEL
The trial court ended up imposing an impossible burdenif it was there you had to find it sooner or file a motion to compel its production. Of course, Mr. Steinhorst was on death row, completely without access to *1253 the records in question. The due diligence demanded here was actually imposed upon voluntary pro bono counsel. It is worth noting that we don't even come close to applying such a high standard for the competency of counsel that a defendant is entitled to for his defense. Indeed, the use of such a standard under the circumstances here, especially for voluntary pro bono counsel, is tantamount to a "heads I win, tails you lose" application of the due diligence/competency standard.

CONCLUSION
This Court was concerned about both the fairness and appearance of fairness in Maharaj, and acted without hesitation to do something about it. Obviously, we should be even more concerned in Steinhorst's case, where the nature of the conflict so fundamentally undermines the fairness of these death penalty proceedings. What a blow to our justice system when we permit a homicide victim's lawyer to later preside over the post-conviction judicial proceedings of the defendant.
KOGAN, C.J., and SHAW, J., concur.
NOTES
[1] The facts and procedural history of this case are available in Steinhorst v. State, 574 So.2d 1075 (Fla.1991) (affirming denial of first 3.850 motion); Steinhorst v. State, 498 So.2d 414 (Fla. 1986) (remanding for evidentiary hearing on first 3.850 motion); Steinhorst v. Wainwright, 477 So.2d 537 (Fla.1985) (denying petition for writ of habeas corpus alleging ineffective assistance of appellate counsel); Steinhorst v. State, 412 So.2d 332 (Fla.1982) (direct appeal affirming convictions and sentences); see also Steinhorst v. State, 438 So.2d 992 (Fla. 1st DCA 1983) (affirming order denying motion to substitute counsel for purposes of executive clemency application).
[2] Steinhorst received a life sentence for the fourth murder conviction.
[3] Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
[4] Hitchcock v. Dugger, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987).
[5] Judge Turner did not preside over the original trial.
[6] Although Steinhorst originally brought the motion pursuant to Florida Rule of Civil Procedure 1.540, we determined on appeal that the motion should have been treated as one brought under rule 3.850 alleging newly discovered evidence. Steinhorst v. State, 636 So.2d 498 (Fla.1994).
[7] The events leading to the murders began at a site called Sandy Creek.
[8] Even if Steinhorst could have waived his claim, I do not think that section 38.02 alone could have served as a basis for that waiver. In my opinion, section 38.02 merely provides that, prior to final judgment, if a defendant does not file a suggestion for disqualification within 30 days of learning of the particular basis for disqualification then the defendant waives the right to raise that basis. This statute does not provide that a waiver occurs if information regarding a basis for disqualification is reasonably available and the defendant fails to file, within 30 days of when that information became reasonably available, a suggestion explaining the basis for disqualification. I recognize however that section 38.06, Florida Statutes (1991), in conjunction with section 38.02 could provide a basis for waiver if waiver was possible in this case. Section 38.06 provides that where grounds for disqualification as set forth in 38.02 appear of record in the cause, but no suggestion of disqualification is timely filed, the order entered by a judge shall be valid. Accordingly, if information regarding Judge Turner's conflict was in the record as the majority concludes it was then, according to section 38.06, Judge Turner's order must be considered valid. I note however that a motion for recusal may be considered after final judgment if good cause for delay in filing is shown. See Fischer v. Knuck, 497 So.2d 240, 243 (Fla.1986). Regardless of how these statutes are interpreted, they cannot supersede a provision of the Constitution.
[9] Again, I note that I believe it is actually section 38.06, in conjunction with 38.02, that the trial court should have identified as a basis for waiver. See supra note 1.
[10] The version of the rule in effect in 1988 gave Steinhorst two years from the time his judgment and sentence became final to file a 3.850 motion.
[11] The original trial and sentencing judge in this case is deceased.
[12] Canon 3E(1) provides:

(1) A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances where:
(a) the judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of disputed evidentiary facts concerning the proceeding;
(b) the judge served as a lawyer or was the lower court judge in the matter in controversy, or a lawyer with whom the judge previously practiced law served during such association as a lawyer concerning the matter, or the judge has been a material witness concerning it;
(c) the judge knows that he or she individually or as a fiduciary, or the judge's spouse, parent, or child wherever residing, or any other member of the judge's family residing in the judge's household has an economic interest in the subject matter in controversy or in a party to the proceeding or has any other more than de minimis interest that could be substantially affected by the proceeding;
(d) the judge or the judge's spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:
(i) is a party to the proceeding, or an officer, director, or trustee of a party;
(ii) is acting as a lawyer in the proceeding;
(iii) is known by the judge to have a more than de minimis interest that could be substantially affected by the proceeding;
(iv) is to the judge's knowledge likely to be a material witness in the proceeding.
Fla. Code Jud. Conduct, Canon 3E.
[13] To make matters worse, the testimony of the clerks at the evidentiary hearing establishes that the all the files for all the defendants in this case were reorganized in 1988. Given that the files have been reorganized, and do not resemble now the state they were in in 1986 when Steinhorst's investigator went to the court to obtain them, there is no way Steinhorst can even attempt to show that the recusal order was not "reasonably available" to him at that time.

Moreover, further testimony of the court clerks reveals that none of them can say for certain that the codefendant's file containing the recusal order was not in the court's vault, which they did not have access to, such that Steinhorst's attorneys could not even have been given this information in 1986 when the files were requested.