828 So.2d 966 (2002)
Roy Clifton SWAFFORD, Appellant,
v.
STATE of Florida, Appellee.
No. SC92173.
Supreme Court of Florida.
April 18, 2002.
Rehearing Denied October 7, 2002.
Martin J. McClain, Special Assistant CCRC-South, Brooklyn, New York, Office *967 of the Capital Collateral Regional Counsel-South, Miami, FL, for Appellant.
Robert A. Butterworth, Attorney General, and Judy Taylor Rush, Assistant Attorney General, Daytona Beach, FL, for Appellee.
PER CURIAM.
Roy Clifton Swafford appeals an order entered by the circuit court denying postconviction relief pursuant to Florida Rule of Criminal Procedure 3.850. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We affirm the circuit court's order for the reasons expressed herein.

FACTS
The facts in this case, as presented in this Court's decision in Swafford v. State, 533 So.2d 270 (Fla. 1988), are as follows:
The evidence showed that on the morning of Sunday, February 14, 1982, the victim was at work at the FINA gas station and store on the corner of U.S. Highway No. 1 and Granada Avenue in Ormond Beach, Florida. Two witnesses saw her there at 5:40 and 6:17 a.m. A third witness, who said he arrived at the station at around 6:20, found no attendant on duty although the store was open and the lights were on. At 6:27 a.m., the police were called, and an officer arrived at the station a few minutes later.
On February 15, 1982, the victim's body was found in a wooded area by a dirt road, about six miles from the FINA Station. She had been shot nine times, with two shots directly to the head. The cause of death was loss of blood from a shot to the chest. Based on trauma, lacerations, and seminal fluid in the victim's body, the medical examiner concluded that she had been sexually battered. Holes in the victim's clothing corresponding to the bullet wounds to her torso indicated that she was fully clothed when shot. The number of bullet wounds and the type of weapon used indicated that the killer had to stop and reload the gun at least once. Several bullets and fragments were recovered from the body.
Swafford and four companions drove from Nashville, Tennessee, to Daytona Beach, Florida, departing Nashville at about midnight on Friday, February 12 and arriving in Daytona Beach at about noon the next day. After setting up camp in a state park, Swafford and some others went out for the evening, arriving back at the campground at about midnight. Then, according to the testimony at trial, Swafford took the car and went out again, not to return until early Sunday morning.
State's witness Patricia Atwell, a dancer at a bar called the Shingle Shack, testified that Swafford was there with his friends on Saturday night, that they left at around midnight, and that Swafford returned alone at about 1:00 a.m. Sunday. When Atwell finished working at 3:00 a.m., she left the Shingle Shack with Swafford. They spent the rest of the night together at the home of Swafford's friend. At about 6:00 a.m., he returned her to the Shingle Shack and left, driving north on U.S. 1, a course that would have taken him by the FINA station. In the light traffic conditions of early Sunday morning, the FINA station was about four minutes away from the Shingle Shack. According to Swafford's traveling companions, he returned to the campsite around daybreak. The court took judicial notice of the fact that sunrise took place on the date in question at 7:04 a.m.
On Sunday Swafford and his friends attended an auto race in Daytona Beach. That evening they went back to the Shingle Shack, where one of the party *968 got into a dispute with some other people over money he had paid in the expectation of receiving some drugs. Swafford displayed a gun and got the money back. The police were called, and Swafford deposited the gun in a trash can in one of the restrooms. The police seized the gun, and ballistics tests performed later conclusively established that Swafford's gun was the gun used to kill the victim. The evidence also showed that Swafford had had the gun for some time. Although the gun was not tested until more than a year after the murder, after authorities received a tip concerning Swafford's possible involvement, evidence established the chain of police custody and the identification of the gun.
....
The jury found Swafford guilty of first-degree murder and sexual battery and recommended a sentence of death. The trial court then sentenced Swafford to death for the first-degree murder.
Id. at 271-73. This Court affirmed. 533 So.2d at 278.

PROCEDURAL HISTORY
After the signing of a death warrant for Swafford's execution in 1990, Swafford filed a rule 3.850 motion. In the motion, he raised the following issues, as set forth in Swafford v. Dugger, 569 So.2d 1264 (Fla.1990):
Swafford raised sixteen issues in his postconviction motion: 1) violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); 2) refusal to provide full access to the state's files; 3) ineffectiveness of counsel at the guilt phase; 4) ineffectiveness of counsel at the penalty phase; 5) conflict of interest of one of Swafford's public defenders who also was a special deputy sheriff; 6) conflict of interest of an attorney who previously represented both Swafford and a codefendant in another criminal matter and who continued to represent the codefendant after conviction; 7) security measures at trial violated Swafford's rights; 8) using an improperly obtained prior conviction to aggravate the sentence; 9) violation of [Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987) ]; 10) the trial court failed to independently weigh the aggravating and mitigating factors; 11) the jury instructions improperly shift the burden to a defendant to show life to be the appropriate penalty; 12) violation of Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); 13) failure to prove corpus delicti of sexual battery; 14) the cold, calculated, and premeditated instruction violates Maynard v. Cartwright, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988); 15) the heinous, atrocious, or cruel instruction violates Maynard; and 16) application of Florida Rule of Criminal Procedure 3.851 violates Swafford's rights.
Id. at 1266-67 (citations omitted). Within the first two claims in this 1990 motion, Swafford alleged in part that the State had committed a Brady violation by withholding material exculpatory evidence obtained during the investigation of various suspects, including James Michael Walsh, as to the instant crime. Swafford contended that this evidence included statements to police by Michael Lestz, who was investigated along with Walter Levi regarding potential involvement in the murder. Swafford argued that Lestz had recounted to police certain statements and activities of Walsh that enhanced Walsh's status as a potential suspect in the instant crime. In a sixteen-page order, the circuit court denied the motion without an evidentiary hearing. Swafford asked this Court to reverse the order and remand for such a *969 hearing. This Court declined to do so, stating in relevant part:
Postconviction proceedings cannot be used as a second appeal. Thus, the court properly found claims 7 through 15 procedurally barred because they should have been raised, if at all, on direct appeal. We also agree with the trial court that the testimony complained about in claim 9 is not the type of victim impact evidence prohibited by Booth. As to claim 5, co-counsel's involvement in the case was minimal and Swafford could not have been prejudiced. The court correctly found claim 6 to be irrelevant. As noted by the court, we have repeatedly held that claim 16 has no merit. Regarding issue 2, the court found that the dictates of [Provenzano v. Dugger, 561 So.2d 541 (Fla. 1990),] and State v. Kokal, 562 So.2d 324 (Fla.1990), had been complied with. We find no abuse of discretion in declining a stay to allow further review of the recently furnished investigatory files.
In claim 1, Swafford argued that the state failed to disclose exculpatory evidence. "The test for measuring the effect of the failure to disclose exculpatory evidence, regardless of whether such failure constitutes a discovery violation, is whether there is a reasonable probability that `had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" Duest v. Dugger, 555 So.2d 849, 851 (Fla.1990) (quoting United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985)). The court found that no Brady violation had occurred and that Swafford had not established the materiality of the information he claims the state withheld. Thus, the court concluded: "There is no possibility that the result of the proceeding would have been different even if all this information were available." Swafford has shown no error in the court's ruling, and we hold that the court correctly refused to hold an evidentiary hearing on this claim.
Claims 3 and 4 alleged ineffective assistance of counsel at both the guilty and penalty phases of trial. To prevail on a claim of ineffective assistance, both substandard performance and prejudice caused by that performance must be demonstrated. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To be granted an evidentiary hearing on such a claim, a petitioner must allege specific facts not conclusively rebutted by the record that show a deficient and prejudicial performance. Here, the court found Swafford's allegations "are refuted by the record, represent trial strategy, or are legally insufficient." The court also held that Swafford had demonstrated no prejudice under any of the claims. Regarding the evidence Swafford now advances, the court stated that Swafford's father would not testify at trial and that his mother could not and that the now-advanced information would not have changed the result. We agree that Swafford's claims fail to meet the prejudice test of Strickland and hold that the court did not err in refusing to hold an evidentiary hearing on claims 3 and 4.
Swafford, 569 So.2d at 1267-68 (citations omitted). In this same decision, this Court also denied Swafford's petition for writ of habeas corpus. Id. at 1268. In the habeas petition, Swafford asserted the following four claims:
(1) ineffective assistance of appellate counsel for not convincing this Court that one of Swafford's statements to a traveling companion should not have been admitted at trial; (2) the state failed to prove sexual battery and counsel rendered ineffective assistance by *970 failing to raise this issue on appeal; (3) victim impact evidence violated Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), South Carolina v. Gathers, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989), and Jackson v. Dugger, 547 So.2d 1197 (Fla.1989), and counsel rendered ineffective assistance by not raising this claim on appeal; and (4) jury instructions improperly shifted to Swafford the burden of showing life imprisonment to be the appropriate penalty.
569 So.2d at 1266. In denying the habeas petition, this Court stated:
We fully considered the admissibility of Swafford's statement on direct appeal. Habeas corpus is not to be used for second appeals. After appellate counsel raises an issue, failing to convince this Court to rule in an appellant's favor is not ineffective performance. Allegations of ineffective assistance of appellate counsel may not be used to evade the rule against using habeas corpus as a second appeal. This issue, therefore, is procedurally barred.
If counsel had challenged the sufficiency of the evidence regarding sexual battery, we would have found no merit regarding that claim. Evidence presented at trial sufficiently supports the sexual battery conviction and the aggravating factors of heinous, atrocious, or cruel and committed during a felony.[n.2] Failing to brief or argue a nonmeritorious issue is not ineffective assistance of appellate counsel. Therefore, we find no merit to Swafford's second issue.
[N. 2:] The victim's being abducted also supports these aggravating factors.
Although Swafford argues that trial counsel objected to the introduction of victim impact evidence, the record does not show any such objections. Appellate counsel, therefore, cannot be considered ineffective for failing to argue a Booth violation because the claim had not been preserved for appeal. Moreover, Booth claims are cognizable in habeas corpus proceedings only in extraordinary circumstances, such as were present in Jackson. Such extraordinary circumstances are not present in this case, and Swafford's third claim is procedurally barred.
The fourth claim, shifting the burden of persuasion, should have been raised on direct appeal, but trial counsel did not object to what current counsel considers error. The claim is, therefore, procedurally barred.
569 So.2d at 1266 (citations omitted).
Thereafter, the Eleventh Circuit granted Swafford a stay of execution, and Swafford's appeal to the Eleventh Circuit was held in abeyance while he continued to seek relief in the state courts. Swafford v. State, 679 So.2d 736, 738 (Fla.1996).
In May 1991, Swafford filed a second habeas corpus petition in this Court, in which he claimed that one of his trial attorneys, Howard Pearl, had a conflict of interest because he was a special deputy sheriff while he represented Swafford. This Court found no merit in the claim and denied the petition, stating:
Several other prisoners who had been represented by Pearl have raised this same issue, and we have remanded for evidentiary hearings on their claim. Notwithstanding the fact that this claim should be raised in the trial court through a motion for postconviction relief, we find that no relief is warranted. Swafford raised this issue in a postconviction motion, and the trial court denied it without an evidentiary hearing. On appeal we affirmed because Pearl's "involvement in the case was minimal and Swafford could not have been prejudiced." *971 Swafford v. Dugger, 569 So.2d 1264, 1267 (Fla.1990). Pearl's minimal participation in Swafford's representation distinguishes this case from [other cases involving a similar claim]. Therefore, we find no merit in Swafford's claim and deny his petition.
Swafford v. Singletary, 584 So.2d 5 (Fla. 1991) (citations and footnote omitted).
Swafford filed a second rule 3.850 motion in November 1991. In that motion, Swafford raised the following claims: (1) violation of chapter 119, Florida Statutes (1989); (2) a violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); (3) ineffective assistance at the guilt phase; (4) factual innocence; (5) attorney Pearl's conflict of interest; (6) ineffective assistance at the penalty phase; and (7) cumulative errors. Swafford v. State, 636 So.2d 1309, 1310 n. 3 (Fla.1994). The circuit court denied the motion without an evidentiary hearing in May 1992. Id. at 1310. After the court denied Swafford's motion for rehearing and disqualification, Swafford appealed the denial of relief to this Court and also moved for relinquishment of jurisdiction, arguing the need for an evidentiary hearing as to whether Swafford's other trial counsel, Ray Cass, had a conflict of interest and on whether the postconviction judge engaged in improper ex parte communications with the State when he directed the Attorney General's office to prepare the orders denying relief in October 1990 and May 1992. Id. This Court granted Swafford's motion to relinquish jurisdiction, and after a hearing, the circuit court again denied relief. Id. On appeal, Swafford presented the following claims in this Court:
(1) The second 3.850 motion should not have been denied summarily; (2) Judge Hammond should have disqualified himself because of ex parte communications; (3) chapter 119 violations occurred; (4) Brady violations occurred; (5) counsel was ineffective at the guilt phase; (6) newly discovered evidence establishes Swafford's innocence; (7) counsel was ineffective at the penalty phase; (8) there were constitutionally invalid penalty instructions and the improper application of aggravators; and (9) Ray Cass had a conflict of interest.
636 So.2d at 1311. In affirming the trial court's denial of postconviction relief, this Court stated:
As noted earlier, we affirmed the summary denial of the first rule 3.850 motion. Summary denial of the second motion was also proper. Thus, issues 3 through 8 are procedurally barred because they were or could have been raised previously. Espinosa v. Florida, 505 U.S. 1079, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992), claims are cognizable in postconviction proceedings if they have been preserved, but Swafford did not preserve the claims he now makes, and they are procedurally barred.
Finally, there is no merit to issue 9. The record shows that Cass had no conflict of interest due to his having been given a deputy sheriff's card by a previous sheriff.
636 So.2d at 1311 (citations and footnote omitted).
During the period when Swafford's motion for rehearing with this Court was pending, defense counsel located Lestz, who provided an affidavit dated April 30, 1994. Swafford, 679 So.2d at 738. Swafford claimed the affidavit of Lestz was newly discovered evidence that corroborated other evidence the State failed to disclose in violation of Brady. Id. The affidavit stated:
1. My name is Michael Eugene Lestz and I live in the state of Illinois. In 1982 I was in Daytona Beach, Florida *972 during the Daytona 500. The Daytona 500 Auto Race took place on Sunday, February 14, 1982.
2. While I was there, I was in the presence of two guys named Walter Levi and Michael Walsh. Michael Walsh borrowed my van on several occasions and without telling me where he was going. I previously told the Daytona Beach sheriff's office about these occasions.
3. I remember, on the day of the Daytona 500, Michael Walsh had two 38 caliber handguns and was in a big hurry to get rid of them. One of these 38's was a hammerless revolver. He told me that the handguns had been used and he had to get rid of them. Walsh started going to different bars in order to get rid of the guns. One of the places Walsh went to get rid of these handguns was the Shingle Shack topless bar. The three of us had been to this bar on several occasions and we were all very familiar with it. Also Michael was acting very nervous on this particular day. He said it was because he didn't want the guns in his possession.
4. A couple of days after the Daytona 500 and after Michael Walsh had gotten rid of the two guns, we were in the parking lot of a store and there were pamphlets about the Brenda Rucker homicide. Walsh became upset and began to snatch the pamphlets off the cars saying they shouldn't be looking for the suspect in Daytona Beach when she was not killed here. Walsh would never tell us what he meant by this.
5. Two sheriff's officers from the Volusia County Sheriff's Department came to interview me when I was in the Marion Federal Prison in Illinois. I gave them detailed, truthful statements of what I could remember at that time. At some point at a later date I remembered some more details and I wrote them back to explain the details to them. They wrote me back and told me to "not worry about it."
6. Because I was with Michael Walsh before and after the incident, I knew how he was acting and I think there is a good chance that he committed the murder of Brenda Rucker.
679 So.2d at 738-39. On the basis of this affidavit, Swafford filed, along with his motion for rehearing, a motion to relinquish jurisdiction and hold appeal in abeyance in light of newly discovered evidence. Id. at 739. In an order dated June 1, 1994, this Court denied Swafford's motion for relinquishment and motion for rehearing. Id.
On June 13, 1994, Swafford filed a third rule 3.850 motion, which is the subject of this appeal. Id. In that postconviction motion, Swafford's sole claim was an allegation that Lestz's affidavit constituted newly discovered evidence which, in conjunction with evidence previously withheld by the State or not discovered by trial counsel, provided a Brady violation and established Swafford's innocence. Id. The circuit court summarily denied the motion without an evidentiary hearing. Id.
On appeal, this Court held:
We reject Swafford's Brady claim because, as we recognized in Swafford's first motion for postconviction relief, the State was not required to provide to defense counsel every piece of information regarding other suspects. Swafford, 569 So.2d at 1267. The introduction of Lestz's statement does not alter that conclusion. However, Lestz's statement places Walsh at the Shingle Shack with a .38 caliber handgun at or near the time that the murder weapon was discovered in that locale. We find this evidence, when viewed in conjunction with the evidence alleged in Swafford's prior 3.850 motion and the conflicting *973 evidence presented in Swafford's original trial with regard to exactly where within the bar the gun was found, is sufficient to warrant an evidentiary hearing on the issue of whether the statement is of such a nature that it would probably produce an acquittal on retrial. See Jones v. State, 591 So.2d 911 (Fla.1991).
We accept as sufficient for the purpose of demonstrating that an evidentiary hearing is required, Swafford's claim that Lestz's statement amounts to newly discovered evidence. Our acceptance is based in part on the State's failure to assert, with regard to this issue, anything more than an allegation that defense counsel had years to find Lestz.

We specifically hold, however, that our acceptance of Swafford's claim in this regard does not mean Lestz's statement is newly discovered evidence as a matter of law. Rather, Swafford's newly discovered evidence claim remains to be factually tested at the evidentiary hearing. Accordingly, we direct the trial court on remand to determine whether Swafford has demonstrated as a threshold requirement that his untimely and successive motion for postconviction relief was filed within two years of the time when Lestz's statement could have been discovered through the exercise of due diligence. See Bolender v. State, 658 So.2d 82 (1995). If the trial court determines that Lestz's statement is newly discovered evidence, it must then determine whether the statement, in conjunction with the evidence introduced in Swafford's first rule 3.850 motion and the evidence introduced at trial, would have probably produced an acquittal.
679 So.2d at 739 (emphasis added) (citations omitted). The circuit court held the evidentiary hearing as to newly discovered evidence claim on February 6 and 7, 1997, and heard twelve witnesses, including Lestz.
On October 21, 1997, the circuit court entered an order finding that Swafford did not file his third rule 3.850 motion within two years of the time when Lestz's statement could have been discovered by due diligence. See State v. Swafford, No. 83-03425CFAES, order at 5 (Fla. 7th Cir. Ct. order filed October 21, 1997). Although the court stated that it was not required to make the second determination, the court briefly examined the issue as to whether Lestz's testimony would have probably produced an acquittal and concluded that Lestz's earlier statements to investigators, his 1994 affidavit, and his testimony at the evidentiary hearing below "contained many inconsistencies" and thus Lestz's testimony to a trial jury would not have probably resulted in an acquittal "given the strong case the state had against Mr. Swafford." Id. at 6. Thus, the circuit court denied Swafford's third rule 3.850 motion.

ISSUES ON APPEAL
Swafford appeals in this Court, raising five claims.[1] We begin our discussion with Swafford's fourth claim, which *974 concerns the threshold due-diligence determination that we ordered upon remand for an evidentiary hearing.

Claim Four
As expressly stated in this Court's decision in Swafford, 679 So.2d at 739, this Court remanded to the circuit court for a factual determination of a discrete threshold requirement for this successive 3.850 motion. At the beginning of the evidentiary hearing, Swafford's counsel framed the issue before the circuit court as follows:
MR. McCLAIN: This case has been remanded obviously by the Florida Supreme Court for Your Honor's consideration. And the Florida Supreme Court directed this Court to consider whether there was newly discovered evidence and whether CCR on behalf of Mr. Swafford exercised due diligence in trying to locate this evidence. This evidence comes from Michael Lestz.
Specifically, the Supreme Court says that after that determination, then this Court is to consider whether that evidence in conjunction with the evidence in the original 3.850 which was filed in October, I believe, of 1990 as well as the evidence at the trial and when you take them all together, is there a probability of acquittal. In other words, do they create a reasonable doubt as to Swafford's guilt.
Following Swafford's counsel's opening statement and the opening statement of the State, the circuit court heard testimony from twelve witnesses. One of the witnesses who testified at the hearing was Lestz. In this testimony, Lestz detailed his location from 1982 until he signed the affidavit that was the subject of this Court's decision remanding to the circuit court. This evidence showed that Lestz was in federal prison until December 3, 1984. Lestz was thereafter on probation for five to six months. During that time, he was in the care of his brother, who was his sponsor. In mid-1985, Lestz moved to Elkville, Illinois, and remained in or within three miles of Elkville until the present. Elkville is a town of approximately 100 residents. Lestz's probation officer, Bruce Chambers, knew where Lestz lived during the early 1990s, even though Lestz was only on probation through mid-1985. Lestz married in 1985, and he and his wife have lived together in the Elkville area since that time. Lestz had motor vehicles title in his name. Some of those titles bore his correct address. The brother's address appeared on Lestz's car loans. Lestz owned and operated a pest control business, and his brother cosigned loans for that business. Chambers, the probation officer, knew about the business.
After receipt of the evidence, the circuit court invited counsel for each side to submit written closing memoranda. After receiving the memoranda and deliberating, the circuit court entered an order that states in pertinent part:
As noted earlier, the Florida Supreme Court mandated this matter back to the trial Court to hold an evidentiary hearing as to the very issue regarding Mr. Lestz's affidavit and whether or not the information contained therein was newly discovered evidence and, if so, its impact had it been presented at trial.
At page 739 of its Opinion, the Florida Supreme Court specifically directed this Court to "accordingly, we direct the trial Court on remand to determine whether Swafford has demonstrated as a threshold requirement that his untimely and successive motion for post-conviction relief was filed in two years of the time when Lestz's statement could have been discovered through the exercise of due diligence. See Bolender v. State, 658 So.2d 82 (Fla.), cert. denied, 515 U.S. *975 1173, 116 S.Ct. 12, 132 L.Ed.2d 896 (1995). If the trial Court determines that Lestz's statement is newly discovered evidence, it must then determine whether the statement, in conjunction with the evidence introduced in Swafford's first rule 3.850 motion and the evidence introduced at trial, would have probably produced an acquittal...."
At the evidentiary hearing, the defense called ten (10) witnesses and the state called two (2) witnesses.
....
This Court now turns to the threshold requirement required by the Supreme Court "... to determine whether Swafford has demonstrated as a threshold requirement that his untimely and successive motion for post-conviction relief was filed within two years of the time when Lestz's statement could have been discovered through the exercise of due diligence ..." See page [739] of Swafford v. State, 679 So.2d 736 (Fla.1996).
After having heard the twelve (12) witnesses who testified at the two (2) day evidentiary hearing and considered all matters and exhibits introduced in that hearing and other matters presented to the Court through the file, record, and transcripts, this trial Court has determined that the defendant has failed to meet this threshold requirement and that this Court finds that the defendant did not file his untimely and successive motion for post-conviction relief within two years of the time when Lestz's statement could have been discovered through the exercise of due diligence.
The defense at the evidentiary hearing in February 1997 introduced into evidence defendant's exhibit 6, which was a supplemental report of the Volusia County Sheriff's Office, of July 26, 1982, regarding their interview of Michael Lestz at Little Rock, Arkansas.
Also introduced at the same hearing as defendant's exhibit 5 was a supplemental report of the Volusia County Sheriff's Office dated January 31, 1983, regarding another interview of Michael Lestz done at Marion, Illinois by the Volusia County Sheriff's investigators.
Both of these reports introduced by the defense indicate that Mr. Lestz gave the names of Mr. Walsh and Mr. Levi to the Sheriff's Office, though the information he gave at that time differed materially from the information now contained in his affidavit of April 30, 1994, obtained by the defense.
Those reports did generally contain information relayed by Mr. Lestz alleging that on the day of the murder that Mr. Walsh dropped Mr. Lestz and Mr. Levi off at a laundry mat approximately ½ block from the gasoline station from which Ms. Rucker was kidnapped and eventually murdered. He further related in those reports, among other things, that he thought Walsh may have been involved in Ms. Rucker's murder.
It is also noted in the July 26, 1982, supplemental report contained in defendant's exhibit 6 that the Volusia County Sheriff's Office also interviewed Mr. Walsh in Hot Springs, Arkansas, and that he basically denied any involvement with the murder.
It should be noted that though the state, prior to the jury trial, failed to list Mr. Lestz, Mr. Levi, or Mr. Walsh as witnesses or exculpatory witnesses, that matter has been addressed previously under the defendant's Brady objections and previously rejected by the trial Court and the Florida Supreme Court in each of the defendant's three (3) separate 3.850 motions for post-conviction relief.
The Court further finds that the evidence introduced at the evidentiary *976 hearing and also the matters contained in the defendant's first 3.850 motion for post-conviction relief, filed October 15, 1990, contained reference to the Volusia County Sheriff's Office supplemental reports mentioned above and contained in defendant's exhibits 5 and 6 at the February, 1997 evidentiary hearing, and because of that, it is clear that as of October 15, 1990, the filing of the first 3.850 motion for post-conviction relief, the defendant's Capital Collateral counsel had information regarding Mr. Lestz and his contention regarding Mr. Walsh and Mr. Levi and that those reports contained information which reasonably could have led to the discovery of Mr. Lestz's whereabouts back in the fall of 1990.
This Court finds specifically that as of October 15, 1990, the defendant was aware of the two (2) Volusia County Sheriff's Office supplemental reports contained in defendant's exhibits 5 and 6 at the February, 1997, evidentiary hearing as they were raised as Brady violations in its first 3.850 motion for post-conviction relief filed on October 15, 1990.
Accordingly, this Court specifically finds that the defendant, through the exercise of due diligence, could have located Mr. Lestz and would have had until October 15, 1992, to file the instant 3.850 motion regarding the alleged information of Mr. Lestz regarding Mr. Walsh's possible involvement in the murder, rather than raising same in its June, 1994, third 3.850 motion for post-conviction relief.
Mr. Lestz testified at the February, 1997, evidentiary hearing on this matter and this Court finds from his testimony that he was living in the same place over that two (2) year time frame of October 15, 1990 through October 15, 1992.
This Court finds from the evidentiary hearing and other matters presented that the defendant's collateral counsel could have located Mr. Lestz within that two (2) year window from October 15, 1990 through October 15, 1992, had they followed up with the information provided by Mr. Lestz and other information contained in the two (2) supplemental Volusia County Sheriff's Office reports received in evidence as defendant's exhibits 5 and 6 at the February, 1997, evidentiary hearing.
Mr. Lestz had provided an address to the Sheriff's Office, which, if followed up, would have led to him living just seven (7) miles away in a very small town of 100 plus citizens.
Further, this Court finds that had the defendant's collateral counsel followed up the information contained in those two (2) reports marked as defendant's exhibit 5 and 6, they could have learned the name of his Federal probation officer and the name of Lestz's brother and the address of Lestz while he was on probation and this Court finds that any of those leads would have led the defense to where Mr. Lestz was residing over that two (2) year time period in Elkville, Illinois, a town of approximately 104 people in 1990.
From the testimony of Mr. Lestz at the evidentiary hearing on this matter held in February, 1997, this Court finds that had the defendant's collateral counsel followed up with the information contained in the two (2) Sheriff's supplemental reports referred to previously, they would have discovered that Mr. Lestz was living in a house approximately three (3) miles from Elkville, Illinois, they would have also discovered that his wife, daughter, and his brother all live in that same very small community and that Mr. Lestz owned and operated a pest control business there. They would *977 have also discovered that Mr. Lestz's brother was well known in the community and had co-signed as a guarantor on Mr. Lestz's car and business loans.
The trial Court will now address briefly any knowledge that the defendant's trial counsel, Ray Cass, may have had regarding any information of other suspects and most specifically, any information regarding Mr. Lestz, Levi, or the alleged involvement of Mr. Walsh with the homicide.
The defendant was defended at the jury trial by Assistant Public Defender Raymond Cass.
Mr. Cass testified at the evidentiary hearing conducted by this Court in February, 1997, and he testified that he had asked the trial prosecutor, Gene White, prior to the start of the jury trial, if there were any other suspects and Mr. Cass testified that prosecutor White told him there had been other suspects, but they had been eliminated.
Attorney Cass indicated this conversation with prosecutor White took place in the prosecutor's office and that prosecutor White gestured at several file boxes in the office and offered Mr. Cass the opportunity to go through Mr. White's files on the Swafford case, but Mr. Cass testified that he declined to do so because of the amount of time involved and that his dealings with Mr. White in the past gave him no reason to mistrust Mr. White's statements that other suspects had been eliminated.
This Court specifically finds that had the defendant's trial counsel, Raymond Cass, taken up prosecutor White's offer to look through Mr. White's files on Mr. Swafford's case, then the trial counsel, weeks before the start of the murder jury trial, would have discovered also those two (2) Sheriff reports referring to information provided by Mr. Lestz regarding any possible involvement of Mr. Walsh and also that Mr. Levi was with them.
As this Court has found that the defendant has failed to meet the threshold requirement as outlined by the Florida Supreme Court, it is not necessary for this Court to address the issue of whether or not the evidence, if introduced at the trial along with other matters raised in the defendant's previous 3.850 motions, would have probably produced an acquittal.
State v. Swafford, No. 83-03425CFAES, order at 2-6 (Fla. 7th Cir. Ct. order filed Oct. 21, 1997) (emphasis added).
In this Court, Swafford now argues that the record refutes the circuit court's conclusions. We expressly remanded the case to the circuit court to make this determination. From our review of the record, we find that competent, substantial evidence supports the circuit court's determination. Therefore, we find our statement in Steinhorst v. State, 695 So.2d 1245 (Fla.1997), to be applicable here in respect to the due diligence issue:
When the evidence adequately supports two conflicting theories, this Court's duty is to review the record in the light most favorable to the prevailing theory. Johnson v. State, 660 So.2d 637, 642 (Fla.1995), cert. denied, 517 U.S. 1159, 116 S.Ct. 1550, 134 L.Ed.2d 653 (1996). Under that standard, we will not alter a trial court's factual findings if the record contains competent, substantial evidence to support those findings.
Steinhorst, 695 So.2d at 1248. Also applicable is our statement in Melendez v. State, 718 So.2d 746 (Fla.1998):
First, to qualify as newly discovered evidence, "the asserted facts must have been unknown by the trial court, by the party, or by counsel at the time of trial, and it must appear that defendant *978 or his counsel could not have known them by the use of diligence." Second, to prompt a new trial, "the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial."
In reviewing a trial court's application of the above law to a rule 3.850 motion following an evidentiary hearing, this Court applies the following standard of review: As long as the trial court's findings are supported by competent, substantial evidence, "this Court will not substitute its judgment for that of the trial court on questions of fact, likewise of the credibility of the witnesses as well as the weight to be given to the evidence by the trial court."

Id. at 1251 (footnotes omitted) (quoting Jones v. State, 591 So.2d 911, 915, 916 (Fla.1991), and Demps v. State, 462 So.2d 1074, 1075 (Fla. 1984)).
Melendez, 718 So.2d at 747-48 (quoting Blanco v. State, 702 So.2d 1250, 1251 (Fla. 1997)) (emphasis added).
Accordingly, we affirm the circuit court's decision that Swafford's successive motion was untimely.

Claims One and Two
Swafford's first two claims, which relate to his allegation that the State withheld material evidence as to other suspects in violation of Brady, are procedurally barred because this allegation was previously raised in Swafford's appeal of the denial of his third rule 3.850 motion and found to be without merit. See Swafford, 679 So.2d at 739.

Claim Three
In his third claim, Swafford contends that the circuit court erred in refusing to admit or take judicial notice of reports as to the staffing and funding of the office that was then known as the Capital Collateral Representative (CCR), which allegedly would have been relevant to the issue of due diligence. We find that this claim was not preserved for appellate review because counsel did not lodge a contemporaneous objection during the proceeding below. Even if this claim were preserved, we find no abuse of discretion by the circuit court.

Claim Five
The fifth claim concerns Swafford's motion to disqualify the entire office of State Attorney John Tanner from his trial because of an alleged conflict stemming from Tanner's representation prior to his election as state attorney of inmate Roger Harper, who was seeking a $5000 reward for inculpatory information that Harper had provided to police investigators concerning Swafford. We find this claim to be procedurally barred because it is outside the scope of the narrow determination we ordered upon remand. After reviewing the record, we also find no merit in this claim.
Accordingly, we affirm the order of the circuit court.
It is so ordered.
WELLS, C.J., and SHAW and HARDING, JJ., concur.
LEWIS, J., concurs in result only.
ANSTEAD, J., dissents with an opinion, in which PARIENTE, J., concurs.
QUINCE, J., dissents with an opinion, in which ANSTEAD and PARIENTE, JJ., concur.
ANSTEAD, J., dissenting.
I fully concur in the dissent by Justice Quince. This case represents one of those truly rare instances where this Court has summarily brushed aside on wholly speculative *979 grounds a colorable claim of actual innocence and a possible serious miscarriage of justice. There has been absolutely no focus here on the reality of what actually happened. Tragically too, the claim arises out of a demonstrated Brady violation where the police and prosecuting authorities failed to provide the defendant, as they were constitutionally obligated to do, with substantial evidence of another person's guilt for the crime for which the defendant has been sentenced to die.
To arrive at this result, the Court has openly embraced a double-standard for lawyer competency in a perverse "heads I win, tails you lose" scenario. That is, this Court has consistently applied minimum standards for competency of counsel when rejecting claims by capital defendants of inadequate counsel, but now applies a double and different standard for the diligence expected of the defendant and his counsel when determining whether the defendant's claim should be rejected because the evidence of his innocence was not discovered by his lawyer a long time ago. To make matters worse, the Court appears to be holding negligent and imposing a "super-lawyer" standard upon an overburdened and under resourced collateral counsel office. At the same time, the Court is refusing to permit the affected defendant to make any claim of ineffectiveness against collateral counsel, whom the Court has found wanting.
PARIENTE, J., concurs.
QUINCE, J., dissenting.
The majority affirms the trial court's denial of 3.850 relief, holding there is competent, substantial evidence to support the trial court's determination that counsel for Swafford did not exercise due diligence in discovering the Lestz statement and that the newly discovered evidence does not undermine confidence in the outcome of the prior proceedings. Because of the problems the Office of the Capital Collateral Representative (CCR) was experiencing with funding and personnel changes, I believe that the evidence supports the conclusion that Swafford's collateral counsel exercised due diligence in obtaining the Lestz information and that the claim was presented in a timely fashion. Additionally, the cumulative effect of all the evidence is of such a nature as to probably produce an acquittal on retrial.

Due Diligence
To qualify as newly discovered evidence, Swafford must not only show that the evidence is new but also prove the evidence could not have been discovered earlier through the exercise of due diligence. A new trial will only be ordered after this threshold is met and the defendant shows that the newly discovered evidence is of such a nature as to probably produce an acquittal on retrial. See Melendez v. State, 718 So.2d 746 (Fla.1998); Jones v. State, 709 So.2d 512, 521 (Fla.1998). Here, it appears that Swafford's CCR attorneys were diligent in trying to find Lestz, but were unable to do so until 1994 because Lestz moved, used fake addresses, and told his family not to disclose his whereabouts. As soon as Lestz was found, CCR obtained an affidavit and filed the third 3.850.
First, it is important to remember that Swafford's case arose during CCR's 1990s funding crisis. When CCR began working on the case, Governor Martinez had already signed Swafford's death warrant. This was common practice at CCR during that time period because CCR was understaffed and had to prioritize cases where death warrants had been signed. At that time, CCR had four experienced attorneys and a handful of attorneys who had just graduated from law school who had no experience in handling capital cases.
*980 Moreover, CCR was also working on eight other capital cases where the death warrants had been signed. Thus, there were limited resources and CCR could not have begun working on Swafford's case prior to September 7, 1990, which is the date the death warrant was signed.
Mr. Nickerson, Swafford's first CCR attorney, described the impossible working conditions at CCR at that time as follows:
Q. What kind of hours did you work in the weeks leading up to filing the 3.850 on Swafford's case?
A. Incredible hours. Just absolutely incredible. I was at CCRI had a couch in my office. I was sleeping in the office. There was a shower that was there. And basically I'm looking at waking up about 7:00 in the morning and working until 12:00, 1:00, 2:00, 3:00 in the morning and then trying to get some sleep and starting the cycle again.
Although Mr. Nickerson moved for additional time to investigate Swafford's case prior to the thirty-day deadline to file the 3.850, he was only able to get a short extension. The first 3.850 was filed on October 15, 1990, a mere six weeks after the death warrant had been signed. Although Mr. Nickerson was aware of Levi, Lestz, and Walsh as other possible suspects from some of the documents in his possession at the time he filed the first 3.850, he did not have time to investigate those leads because he was busy reading the record, finding the witnesses who had testified at the trial, and writing the initial 3.850. CCR did not have the funding to hire additional investigators, and the few who were on staff were sparsely divided between all of the priority cases. Mr. Nickerson had one investigator to work on Swafford's case, but that was only for a week or two at a time. He could not send out the new attorneys because they had no experience and did not know how to begin investigating. Thus, the majority of the investigation had to be done by Mr. Nickerson.
Despite the fact that Mr. Nickerson had included in the 3.850 motion information concerning outstanding public record requests which had not been received prior to the deadline for filing the brief and had indicated that he would be filing an amended brief when those documents were received, the trial court summarily denied 3.850 relief on October 24, 1990, less than two months after the signing of the death warrant. At that point, Mr. Nickerson had to discontinue all investigations and concentrate on the appeal to this Court based upon the record as it existed below. During that time, Mr. Nickerson received over 1000 documents related to the case, many of which he had only had a chance to briefly glance at prior to filing his brief in this Court. In describing the process, Mr. Nickerson commented: I remember that it was so bad that the appendix that was submitted to the Florida Supreme Court on the brief to them was scary. Because we were submitting inwe just had to take documents, put them all together and give them to the Florida Supreme Court saying, we haven't had a chance to look at them, this is what they have provided us, we think these support our allegations. And they were submitted to the [Court] without any typeattempt to try and integrate them, because we didn't have time.
This Court affirmed the summary denial, which forced Mr. Nickerson to file a federal habeas corpus action. The Eleventh Circuit ultimately stayed the case.
Around November of 1990, after the Eleventh Circuit granted the stay, Mr. Nickerson resigned from CCR. The case was not officially reassigned to another lead attorney until approximately April of *981 1991, when Mr. McClain joined CCR and inherited it. The reason for the delay between December of 1990 and April of 1991 was that there were no experienced CCR attorneys available to take the lead on the case and it was a lower priority than many of the other capital cases which had not been stayed. Mr. McClain assigned the task of finding Levi, Lestz, and Walsh to a young attorney named Mr. Shabazz.
Mr. Shabazz testified that between April 1991 and October 1992 he was responsible for trying to locate Levi, Lestz, and Walsh. Mr. Shabazz tried many avenues to accomplish this task, including checking with Florida and federal prison systems, Florida and other likely states' departments of motor vehicles, credit computer checks, and a national tracking organization called Global Tracking. At that time, Global Tracking was the best method for finding individuals who did not want to be found. Unfortunately, none of these attempts were successful.
In October of 1992, CCR hired Mr. Chavis as an investigator. The responsibility to find Levi, Lestz, and Walsh was then turned over to him. Mr. Chavis pursued many of the same avenues that Mr. Shabazz had previously pursued, including contacting Global Tracking on at least two occasions in 1993 and 1994. In 1993 Global was unable to find an address for Lestz; however, in 1994, Global was successful. Mr. Chavis promptly flew to Indiana to pursue Lestz. Within two to three weeks of getting the address from Global, Mr. Chavis obtained the affidavit referenced above. The third 3.850 was filed within two weeks of receiving this affidavit.
The court below found that CCR was not diligent in pursuing Mr. Lestz after 1990 and therefore the affidavit did not meet the threshold requirement for newly discovered evidence. The court primarily relied upon three pieces of information that CCR had access to: (1) Lestz's former address; (2) Lestz's brother's name; and (3) Lestz's probation officer's name. The court reasoned that CCR should have flown to Illinois to personally investigate the old address. The court concluded that if CCR had done this, it would have discovered that Lestz's brother lived in a small town in Illinois, near the town where Lestz lived. By going to these small towns, CCR should have been able to discover Lestz's address and been able to get the affidavit by 1992. The court also relied upon the fact that CCR did not approach Lestz's brother or probation officer to get information on his whereabouts.
The court's logic appears to be flawed because it was premised on an illogical conclusion and anchored in a foundation of hindsight. First, the court premised its argument on an illogical conclusion that CCR attorneys or investigators should have jumped on a plane to personally investigate the old Illinois address. This premise gives no consideration to the fact that the address in the police reports was seven years old in 1990 and that all of CCR's attempts to link this address with Lestz were unsuccessful. CCR repeatedly called the phone numbers associated with the old address and could never get anyone to acknowledge that they even knew Lestz. The police reports had painted Lestz as a transient drifter traveling the country and supporting himself by stealing. Lestz even testified that he never stayed in an area for more than a week at a time from age thirteen until he was thirty years old in 1982. He also testified that the address contained on his Illinois driver's license was a false address of a hotel where he would stay sometimes when he drifted into Southern Illinois. Accordingly, the court's premise, that CCR was not diligent for failing to jump *982 on a plane and fly to Illinois, appears to be illogical when there was no information to show that the address had any current links to Lestz's whereabouts.
The court also errs in relying upon the clarity of hindsight. The court concludes that by going to a small town it would have been easy for CCR to find Lestz. This analysis seems clear when the whole picture has been painted; however, this Court should look at CCR's actions and judge the reasonableness of the actions based upon the facts known to CCR at that time. Lestz moved two times after getting out of prison. The first time was to the small town near the town where the seven-year-old address was located. The second move was to another small town a few miles away. The court concluded that this trail should have been easy to follow because the town was small and nearby, but it does not explain how CCR should have done this. First, as discussed above, CCR was not able to link Lestz with the first small town. Second, there was a move after the first move. Lestz never forwarded any mail and put all traceable documents in his brother's name. Lestz's reason for doing these things was that he did not want to be found.
The court also states that CCR should have been able to get Lestz's address from his brother or his probation officer. This is not supported by the record. In fact, Lestz testified that his entire family was told not to tell anyone where he was because he did not want to be found. His former probation officer told the state's investigator information about Lestz, but specifically told her that the only reason he was allowed to give her the information was because she worked for the state. Accordingly, there was nothing in the record to support the court's analysis that talking to Lestz's brother and probation officer would have revealed his whereabouts.
The court's analysis looks at what CCR did not do, rather than looking at the actions CCR took. CCR called the phone numbers associated with the former address trying to make a link to Lestz, checked with the state and federal prison systems, ran credit checks, and hired a tracing company which specializes in finding people who do not want to be found. This is not a case where the defendant's counsel has intentionally waited until the eleventh hour to file a last-minute appeal alleging a whole new series of facts. Rather, CCR made systematic and continuous efforts to locate Lestz, Levi, and Walsh. Thus, it appears CCR acted with due diligence, and the trial court's contrary decision is not supported by competent, substantial evidence in the record.

Prejudice
Having demonstrated due diligence in presenting his claims to the courts, Swafford must also show that the new evidence substantially undermines confidence in the outcome of prior proceedings or is of such a nature as to probably produce an acquittal on retrial. See Robinson v. State, 707 So.2d 688 (Fla.1998); Blanco v. State, 702 So.2d 1250 (Fla.1997). As directed in Swafford v. State, 679 So.2d 736 (Fla.1996), a determination must be made whether the statement in conjunction with the evidence introduced in Swafford's first and second 3.850 motions, as well as the evidence introduced at trial, would have probably produced an acquittal. See State v. Gunsby, 670 So.2d 920 (Fla.1996). Swafford has also demonstrated this prong of his newly discovered evidence claim.
From the time of his arrest, Swafford has maintained his innocence. During opening argument the defense indicated the evidence would demonstrate that innocence: evidence that included a composite *983 drawing[2] which did not resemble Swafford; a description by a witness, Paul Seiler (Seiler) that was not a description of Swafford; a description of the last vehicle to leave the FINA station, the vehicle believed to be involved in the abduction of Rucker that was not the vehicle Swafford was in; and the fact that the gun from the Shingle Shack was given to the police by a bouncer. During Seiler's deposition he was sure of the descriptions he had given to the police. He even indicated he had seen the person and the car a few days later; he followed the car to the Hidden Hills neighborhood, recorded the tag number, and called the police with a further description and indicated he could positively identify the driver of the vehicle. However, at trial Seiler's description of the individual was more tentative, and he could not remember how he arrived at the description he gave the police.
Swafford's initial motion for postconviction relief filed pursuant to Florida Rule of Criminal Procedure 3.850 contained a number of allegations that the State violated the principles espoused in Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by withholding exculpatory or impeaching evidence from the defense. At the first 3.850 proceeding it was revealed that prior to trial, Seiler was arrested and indicted on charges of sexual acts with children. Four months after he testified in the Swafford trial, Seiler pled guilty and did not receive any jail time. It was also learned that Seiler had been hypnotized by the police to clarify his memory. This information was not disclosed to defense counsel.
In closing argument, defense counsel pointed out the inconsistencies in the State's case, such as the fact that the bouncer indicated he retrieved the gun from the men's room and gave it to the police, while a waitress from the Shingle Shack testified she escorted Swafford to the ladies' room, saw him put the gun in the trash in the ladies' room, and the police retrieved it from that location. Counsel also opined that Roger Harper (Harper), whom Swafford implicated in a robbery, implicated Swafford in the murder case to further his own chances of getting out of jail. Furthermore, counsel pointed out the fact that Harper was in touch with his family, the Johnsons, while he was in jail, and that one of the Johnsons testified at trial concerning an alleged conversation with Swafford about getting a girl and shooting her. Counsel also indicated that it was only after Harper cooperated with the police that they tested the gun retrieved from the Shingle Shack.
At the initial 3.850 hearing, information was revealed that Harper was granted early release in exchange for his testimony at the Swafford trial. He also received a $10,000 reward from the FINA Corporation for cooperating at trial. Harper blamed Swafford for the breakup of his marriage and was instrumental in getting his family member from Tennessee to testify against Swafford.
Another Brady allegation in the first 3.850 motion was that the State violated Brady by withholding police investigative and other reports regarding Walsh, Levi, and Lestz. These investigative materials revealed the following information which pointed to other persons as the likely perpetrators of the murder. Rucker was shot nine time with different bullets, one of which was homemade. The Lestz affidavit puts Walsh in possession of two .38 caliber weapons. There was also evidence that *984 Walsh had various .38 bullets, and that his modus operandi was using various .38 caliber shells. Several types of .38 bullets were removed from Rucker's body during the autopsy. Walsh has a history of sexual conduct, and even burned Lestz with cigarettes during a homosexual encounter. Similar cigarette burns were found on the murder victim's body. Additionally, Walsh's wife had a car that was similar to the description given to the police by Seiler.
When Walsh was interviewed by the police, he became nervous when asked about Rucker. When he was arrested for a robbery, he had a composite BOLO of the Rucker murder suspect in his back pocket, and that composite resembled him. The arresting agency called the Volusia County police to give them this information. Also, there were statements made by Lestz concerning Walsh, including a statement that Walsh admitted committing three murders in Florida and that one of the three victims was a white female. Lestz placed Walsh in the vicinity of the murder at a laundromat one day before the murder. Additionally, Lestz told investigators that Walsh and Levi[3] left the motel around 6 a.m. on the day of Rucker's murder. The Lestz affidavit also places Walsh in the Shingle Shack trying to dispose of two .38 caliber guns at or near the same time that the police either were given or retrieved a gun from one of the restrooms at the Shingle Shack.
Thus, when the evidence from the trial, the evidence from the prior 3.850 proceedings, and the newly discovered evidence are viewed for their cumulative effect, Swafford has demonstrated he is entitled to a new trial. Defense counsel promised the jury in his opening statement that he would show that Swafford was not guilty and that someone else committed the murder. But defense counsel's only real witness was Seiler, a person who had originally given the police a description of someone at the FINA station, a description that did not match Swafford. However, by the time of trial, Seiler was tainted, incredible, and unable to remember whether he could actually identify the person he saw, even saying he could not rule out Swafford. Defense counsel had no idea why Seiler was suddenly unable to confirm his initial description. Defense counsel was unaware of Seiler's own problems with the criminal justice system and did not know that the police had hypnotized Seiler to help clarify his memory.
Additionally, defense counsel was not given information concerning the prior investigations of Walsh, Levi, and Lestz. Thus, defense counsel was unable to present testimony that Walsh was the person who matched the description given by Seiler. Had defense counsel been given the investigative materials, he could have identified Walsh as the man in the composite. Moreover, defense counsel would have been able to connect Walsh with the type of bullets removed from the victim's body based in part on the Lestz affidavit, which connected Walsh with .38 caliber weapons and ammunition.
This cumulative evidence also indicates that the other investigations that were commenced were suddenly abandoned when Harper approached the police and implicated Swafford. Defense counsel was not provided with copies of all of the correspondence between the State and Harper negotiating Harper's testimony. Harper negotiated to be released from jail in exchange *985 for his testimony. This information, coupled with the fact that Johnson, the witness who said he talked with Swafford about finding a girl, and Harper were relatives, provides a much more compelling impeachment tool.
In reviewing the impact that the withheld materials might have on the defendant's case, we must assess the cumulative effect of all of the evidence. See Kyles v. Whitley, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). We should assess the importance of the suppressed materials together with the evidence actually presented in the case. Additionally, we must consider not only the fact that the suppressed evidence deprived Swafford of direct evidence but that it also hindered his ability to investigate other aspects of the case. As the United States Supreme Court directed in United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), we must consider any adverse effect the prosecutor's failure to disclose information might have had on the defendant's ability to prepare and present evidence. This defendant was left without the tools to demonstrate and argue to the jury his theory of the case, that another person committed the murder.
The highly circumstantial evidence produced at trial, along with the evidence Swafford claimed in his first 3.850 motion was not disclosed by the State concerning other suspects and witnesses, when considered in conjunction with the Lestz affidavit, would probably produce an acquittal at trial. I would therefore reverse the trial court's decision denying 3.850 relief and remand this case for a new trial.
ANSTEAD and PARIENTE, JJ., concur.
NOTES
[1] Swafford claims that: (1) the State's false argument in 1990 as to its investigation and discarding of three potential suspects defeats any procedural bar that could arise from prior decisions of this Court; (2) the State failed to disclose evidence that was material and exculpatory; (3) the circuit court erred in refusing to admit or take judicial notice of the Overton Commission Report and the Shevin Report as to adequacy of staffing of the Capital Collateral Representative; (4) the circuit court erred in concluding that collateral counsel did not use due diligence in locating newly discovered evidence; and (5) the circuit court erred in denying Swafford's motion to disqualify the office of State Attorney John Tanner.
[2] The composite was ruled inadmissible because it was hearsay and did not fit into any exception to the hearsay rule. Additionally, the court found the composite was not valid impeachment evidence. Therefore, the jury was not presented with this piece of evidence.
[3] When Levi was questioned by the police, he indicated that it was Walsh and Lestz who left the hotel together that morning.